Jane STEPHENSON, Plaintiff
Below, Appellant,

v.

CAPANO DEVELOPMENT, INC.,
Defendant Below, Appellee.

Supreme Court of Delaware.

Submitted: March 15, 1983.
Decided: May 24, 1983.

David S. Lank, Theisen, Lank, Mulford & Goldberg, P.A., Wilmington, for appellant.

Edward M. McNally, Morris, James, Hitchens & Williams, Wilmington, for appellee.

Before HERRMANN, C.J., MOORE, J., LONGOBARDI, Vice-Chancellor (sitting by designation pursuant to Del. Const. art. IV, § 12).

MOORE, Justice:

In this appeal from the Superior Court we address a matter of first impression—the right to and measure of damages under the Consumer Fraud Act (6 *Del.C.* §§ 2511–26) ("Act") as a result of fraudulent statements, concerning the availability of mortgage financing, in connection with the purchase and sale of real estate.

Following her successful suit in the Court of Chancery for specific performance of an option contract to buy a house, Jane Stephenson sued Capano Development, Inc. (Capano) in Superior Court, alleging that Capano violated the Act and the Uniform Deceptive Trade Practices Act (6 *Del.C.* §§ 2531–36) in the sale of that house. The trial judge ruled on cross-motions for summary judgment, and held, despite Capano's violations of the Act, that Stephenson had suffered no actual damages. Therefore, judgment was entered for Capano.

On appeal Stephenson claims that the factual findings of the Court of Chancery in the specific performance action established Capano's liability under the Act, and the Superior Court judge erred as a matter of law in failing to give full legal effect to those findings. We agree. The plaintiff also contends that she incurred actual damages by having to pay a higher interest rate on her mortgage than that which Capano falsely advertised was available to prospective buyers.

By virtue of the facts hereinafter set forth, we have no doubt that Capano engaged in false advertising, an unlawful practice under the Act. Thus, we accept the premise that an element of damages in this situation may include the difference between the interest rates which Capano falsely represented were available and the interest rate which this plaintiff is now required to pay. Since the assessment of damages is a factual matter, we reverse and remand for trial on that issue.

## I.

We refer to the relevant facts determined in the Chancery action: Capano, operating under a different trade name, was the developer of a residential area known as Londonderry. In January 1980, it advertised in the Wilmington newspapers that it was about to construct and sell townhouses in "section 3" of Londonderry, which was to contain six buildings, each with seven units. Originally, Capano had planned to sell all of the units, but at some point it then decided to retain ownership of all the townhouses and rent them. Later, a change in economic circumstances led to a return to the initial plan of selling the units. The ads specifically stated that mortgage funds, backed by New Castle County, were available on the basis of a 10 per cent down payment at an interest rate of 9⅞ per cent. The newspaper advertisements also indicated that ninety-five per cent financing was privately available through Capano. Plaintiff was told that Capano had funds to make 30-year mortgages on the basis of 5 per cent down at 10⅞ per cent interest.

Stephenson, who was responsibly employed, but had modest financial resources, wanted to buy her own house, and was attracted by the possibility of obtaining a low-interest mortgage. Accompanied by members of her family and a friend who was a realtor, she met Mr. Steele, a Capano salesman, at the Londonderry sample house on January 25, 1980. Steele showed her a plan of the proposed development, and gave her a brochure stating that the sales price for interior units was $48,000, and end units were $49,000. Stephenson decided that she was interested only in the end unit (Lot 160) of what was designated Building 17, primarily because of the attractive view which it alone commanded. Steele told her that Building 17 did not exist, though construction was scheduled to start in April. Nonetheless, plaintiff wanted only this end unit. No details about financing were mentioned, but Steele confirmed that money from the County mortgage program would be available for purchasing the townhouse. At the end of the meeting he told her that Lot 160 would be held for her until January 28, and, apparently for that purpose, Lot 160 was marked as "sold" on a wall map.

Returning to the sample house the next day, Stephenson met another Capano salesperson, Ms. Jackson. Again, plaintiff confirmed her desire to buy Lot 160. During the conversation, Jackson acknowledged the existence of the advertised financing plans, indicating that there were sufficient funds for the entire development, but no information was taken concerning Stephenson's qualifications for such financing. Shortly thereafter, Steele told Stephenson that he would prepare Capano's standard form sales agreement for her to sign and would be in touch with her. However, several weeks passed, Steele did not call, and he apparently ignored Stephenson's attempts to reach him.

Eventually, contact was made, and on March 1, Stephenson paid a $1,000 "retainer" on Lot 160, as requested by Steele in a

letter dated February 21. Ms. Jackson gave plaintiff a receipt for a $1,000 payment on Lot 160. Stephenson also understood, and evidently agreed, that there would be a potential increase in the quoted sales price of up to 5 per cent to cover unanticipated or increased construction costs that might occur between execution of a contract and completion of construction. This meant that the final sales price could go up to $52,395. However, plaintiff was satisfied with this arrangement and reaffirmed her desire to sign a contract to buy Lot 160. In particular, she was not concerned about the potential price change so long as the low interest, low down payment mortgage financing was available. Still, nothing had been done concerning plaintiff's desire to seek County-backed mortgage financing even though she had made it clear to both Jackson and Steele that she hoped to finance her purchase in this way.

About two weeks later, Capano's management told the sales staff that two of the proposed structures, including Building 17, would be retained for rental and investment purposes instead of being offered for sale. This was another zig-zag in Capano's position on the subject, which apparently was unexpected by the sales staff, since three other people in addition to Stephenson had paid "retainers" for units in these buildings. Later, these buyers either accepted different units or a refund. However, Stephenson was unhappy and demanded her right to purchase Lot 160. Thus, in May 1980 she filed suit against Capano in the Court of Chancery, seeking specific performance and ancillary relief. By this time the County-backed, low interest mortgage money had long since been exhausted, as had the limited supply of 10⅞ per cent mortgage funds, which Capano had advertised were privately available through it. Yet, even at the time of trial Capano was still advertising the availability of both financing alternatives to prospective buyers.

Two days before trial Stephenson moved to amend her complaint to include alleged violations of both the Act and the Deceptive Trade Practices Act. Because the amend-

ment was untimely, the present Chancellor refused to consider these issues, noting that his action was not to "be construed as any finding on the merits of any such claims". After trial the Chancellor concluded that plaintiff had an option to enter into a contract to buy Lot 160 at a price between $49,000 and $52,395. Contrary to Stephenson's claim, there was no enforceable contract right with respect to financing. A decree of specific performance, compelling transfer of Lot 160, was then entered against Capano. We affirmed in June 1981. Thereafter, Stephenson privately obtained a 30-year mortgage for $47,000 at 12.7 per cent interest.

Following the Chancellor's decision, Stephenson filed the present suit against Capano in Superior Court, raising the same claims of fraud belatedly presented to the Chancellor. She moved for summary judgment on the issue of liability, arguing both that Capano was collaterally estopped from relitigating the Chancellor's findings, and that the decision included a determination of Capano's liability for consumer fraud. The Superior Court judge denied the motion, holding that the findings of fact were to receive collateral estoppel effect, but since the Chancellor did not reach the legal merits of Stephenson's present claims, the doctrine of res judicata was inapplicable. On Capano's cross-motion for summary judgment, the judge held that the Uniform Deceptive Trade Practices Act did not apply to the sale of real estate. In addition, Stephenson had not established actual losses due to Capano's advertisements and misrepresentations. Judgment was entered for Capano, and Stephenson has appealed.

## II.

### A.

■ Stephenson first contends that the Superior Court failed to give proper res judicata effect to the earlier decision of the Court of Chancery. However, this argument erroneously assumes that the Chancellor reached conclusions of law on Stephenson's claims of consumer fraud and deceptive trade practices. He did not. The only

issue resolved on the merits was Stephenson's contract claim. The plaintiff's allegations of fraud were not considered for procedural reasons, and the Chancellor expressly made no determination of the merits of those questions. Thus, while Chancery's findings of fact must be given collateral estoppel effect, *e.g., Winkler v. Balentine,* Del.Supr., 254 A.2d 849, 851 (1969), the Superior Court judge was not bound by res judicata, since the Chancellor did not reach any conclusions on the issue of fraud. *See Equity Corp. v. Groves,* Del.Ch., 53 A.2d 505, 509 (1947); *Williams v. Daisey,* Del.Super., 180 A. 908, 910 (1935); Restatement (Second) of Judgments § 27 comment e (1982). Therefore, the trial judge was required to determine from the previously established facts whether Capano had engaged in consumer fraud or deceptive trade practices. He so concluded, but left plaintiff bereft of a remedy. That was error.

### B.

■ Though the Uniform Deceptive Trade Practices Act (6 *Del.C.* §§ 2531–36)

1. Section 2532(a) provides:

A person engages in a deceptive trade practice when, in the course of his business, vocation, or occupation, he:

(1) Passes off goods or services as those of another;

(2) Causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services;

' (3) Causes likelihood of confusion or of misunderstanding as to affiliation, connection, or association with, or certification by, another;

(4) Uses deceptive representations or designations of geographic origin in connection with goods or services;

(5) Represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have, or that a person has a sponsorship, approval, status, affiliation, or connection that he does not have;

(6) Represents that goods are original or new if they are deteriorated, altered, reconditioned, reclaimed, used, or secondhand;

(7) Represents that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;

prohibits a variety of conduct with respect to the sale of "goods or services,"[1] *Young v. Joyce,* Del.Supr., 351 A.2d 857 (1975) makes clear that the Act does not apply to the sale of real estate. 351 A.2d at 859. By contrast, the Consumer Fraud Act (6 *Del.C.* §§ 2511–26) explicitly covers unfair or fraudulent practices in the sale of real estate. 6 *Del.C.* §§ 2511(2), 2513(a).[2] Since the purpose of this statute is "to protect consumers and legitimate business enterprises from unfair or deceptive merchandising practices in the conduct of any trade or commerce," the isolated sale of real estate by its owner, outside a course of trade or commerce, does not lie within the scope of the Act. *Young,* 351 A.2d at 860. However, those involved in the sale of real estate as a business or occupation are subject to the Act. *See id.* Obviously, Capano was engaged in the sale of houses and land as a business, and Stephenson's complaint thus stated a cause of action under the Consumer Fraud Act, although not under the Uniform Deceptive Trade Practices Act.

(8) Disparages the goods, services, or business of another by false or misleading representation of fact;

(9) Advertises goods or services with intent not to sell them as advertised;

(10) Advertises goods or services with intent not to supply reasonably expectable public demand, unless the advertisement discloses a limitation of quantity;

(11) Makes false or misleading statements of fact concerning the reasons for, existence of, or amounts of, price reductions; or

(12) Engages in any other conduct which similarly creates a likelihood of confusions or of misunderstanding.

2. Section 2513(a) states:

The act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise, whether or not any person has in fact been misled, deceived or damaged thereby, is an unlawful practice. "Merchandise" is defined by section 2511(2) as "any objects, wares, goods, commodities, intangibles, real estate or services".

## C.

At common law, fraud (or deceit) consists of:

1) a false representation, usually one of fact, made by the defendant;

2) the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth;

3) an intent to induce the plaintiff to act or to refrain from acting;

4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and

5) damage to the plaintiff as a result of such reliance.

*Nye Odorless Incinerator Corp. v. Felton,* Del.Super., 162 A. 504, 510–11 (1931); W. Prosser, *Law of Torts,* 685–86 (4th ed. 1971). But fraud does not consist merely of overt misrepresentations. It may also occur through deliberate concealment of material facts, or by silence in the face of a duty to speak. Thus, one is equally culpable of fraud who by omission fails to reveal that which it is his duty to disclose in order to prevent statements actually made from being misleading. *See Lock v. Schreppler,* Del.Super., 426 A.2d 856, 860–61 (1981) (concealment of material facts); *Leech v. Husbands,* Del.Super., 152 A. 729, 731–32 (1930) (same).

Equity courts developed their own requirements for relief from fraud. However, the only departure from the common law elements was Chancery's willingness to provide a remedy for negligent or innocent misrepresentations: the defendant did not have to know or believe that his statement was false or to have proceeded in reckless disregard of the truth. *Eastern States Petroleum Co. v. Universal Oil Products Co.,* Del.Ch., 3 A.2d 768, 775 (1939); 3 Pomeroy's *Equity Jurisprudence* §§ 887–88a (5th ed. 1941); Prosser, *supra,* at 687–88.

The Consumer Fraud Act differs from the traditional legal and equitable actions in three ways. First, the definition of unlawful practices [6 *Del.C.* § 2513(a) ] incorporates the principle that a negligent misrepresentation is sufficient to violate the statute. *In re Brandywine Volkswagen, Ltd.,* Del.Super., 306 A.2d 24, 28–29, aff'd *sub nom., Brandywine Volkswagen, Ltd. v. State,* Del.Supr., 312 A.2d 632 (1973). The defendant need not have intended to misrepresent or to make a deceptive or untrue statement. 306 A.2d at 29. Instead, the only intent requirement of the Act is that in omitting or concealing a material fact, the defendant must have intended that others rely on the omission or concealment. *Id;* 6 *Del.C.* § 2513(a). · Second, the plaintiff traditionally had to demonstrate that he reasonably or justifiably relied on the defendant's statements. *E.g., Nye Odorless Incinerator Corp.,* 162 A. at 510; Restatement (Second) of Torts § 537(b) (1977). An unlawful practice under section 2513(a), however, is committed regardless of actual reliance by the plaintiff. Finally, any misrepresentation had to be made with the intent to induce action or inaction by the plaintiff. *Traylor Engineering & Mfg. Co. v. National Container Corp.,* Del.Super., 70 A.2d 9, 13 (1949); *Nye Odorless Incinerator Corp.,* 162 A. at 510; Pomeroy, *supra,* at §§ 879–80; Restatement (Second) of Torts § 531. The statute does not require proof of such intent. *See Brandywine Volkswagen, Ltd.,* 306 A.2d at 29. In all other respects, however, the statute must be interpreted in light of established common law definitions and concepts of fraud and deceit. *See Makin v. Mack,* Del.Ch., 336 A.2d 230, 234 (1975); *Cohen v. Krigstein,* Del.Super., 114 A.2d 225, 227 (1955); *Mascola v. Mascola,* N.J.Super.A.D., 168 N.J.Super. 122, 401 A.2d 1114, 1117 (1979).

Capano's newspaper advertisements, concerning the availability of county mortgage money, as well as financing obtainable through Capano itself, were of obvious material significance in attracting the plaintiff to Londonderry. From the beginning Stephenson made it clear that she was interested in a Capano townhouse because of these special financing plans. While Capano had received a commitment for $500,000 through the county program, the Chancellor

observed that this was not enough to finance the sale of all the townhouses. The $500,000 was distributed to buyers on a "first-come, first-served" basis, and having actually become available in mid-March, it was exhausted by the end of April. Worse, the money that Capano itself was willing to lend was only sufficient to finance the purchase of *one* townhouse. Capano's agents, however, stated that there was sufficient money to finance the entire development, which was patently untrue.

The financing plans involved here can not be regarded as independent and divisible from the sale of the land and the townhouse. With the sharp rise in interest rates over the past few years and the attendant reduction in funds for residential mortgages, potential homeowners have found financing difficult, if not impossible, to obtain. Relatively low interest, low down payment mortgages, such as those advertised by Capano in January 1980, thus became an important factor in the decision to purchase a particular house. *See Donovan v. Bachstadt*, N.J.Supr., 91 N.J. 434, 453 A.2d 160, 166–67 (1982). Capano, therefore, was not just advertising townhouses, but townhouses *and* the availability of desirable mortgage terms to enhance the sale of those dwellings.

However, Capano did this knowing that it could not meet a reasonably expected demand for the money it represented was available. If the arrangements to obtain the county mortgage funds were incomplete when the townhouses were advertised in January 1980, then at the very least, Capano acted negligently in stating that such mortgages were available. Furthermore, this method of financing had limitations not usually found in a residential mortgage, e.g., a ceiling on the applicant's income. Thus, the mortgages were not available to all buyers, who normally would be considered qualified borrowers. In any event,

Capano's deliberate and wholly unjustified attempt to renege on the sale of this property, thereby forcing plaintiff to Court on that matter, conclusively interfered with her rights to seek even the limited funds available for a short time in March and April 1980.

Clearly, Capano was not advertising the townhouses in a manner consistent with the actual circumstances. Failing to make relevant disclosures created the belief, as exemplified by Stephenson's actions, that a purchaser could obtain one of two types of mortgages at any time until the last townhouse was sold. That situation bore little resemblance to reality. Recognizing the intrinsic relationship between the purchase of a specific house, and financing that purchase, we conclude from the facts which Capano is collaterally estopped from denying, that it misrepresented the circumstances regarding the availability of relatively low cost mortgages, and in doing so, violated the Consumer Fraud Act. *See also Nash v. Hoopes*, Del.Super., 332 A.2d 411 (1975); *In re Brandywine Volkswagen, Ltd.*, Del. Super., 306 A.2d 24, *aff'd sub nom., Brandywine Volkswagen, Ltd. v. State*, Del.Supr., 312 A.2d 632 (1973).

Since the sale price of the townhouse was within the terms of Stephenson's original contract, Capano claims it did not profit from any unlawful practice and therefore is not liable. This argument ignores the plain words of section 2513(a): an unlawful act need only be done "in connection with the sale or advertising of any merchandise". The statute does not require that the defendant profit or benefit from his fraudulent conduct. *See also McKinnon v. Tibbetts*, Me.Supr., 440 A.2d 1028 (1982); 37 C.J.S. *Fraud* § 44 (1943). While Capano contends otherwise, section 2525 [3] does not add to section 2513(a). Instead, section 2525 only indicates that the remedies under

---

**3.** That section reads:

Subject to an order of the Court terminating the business affairs of any person after receivership proceedings held pursuant to this subchapter, the provisions of this sub-

chapter shall not bar any claim against any person who has acquired any money or property, real or personal, by means of any acts or practices declared by this subchapter to be unlawful.

the Consumer Fraud Act, though broad, are not exclusive.

### III.

#### A.

Although the trial judge recognized that Capano had misrepresented the availability of mortgages, he interpreted *Young v. Joyce,* Del.Supr., 351 A.2d 857 (1975) and the Act as requiring the misrepresentation to have caused actual damage. He therefore concluded that because Stephenson had obtained the townhouse through her Chancery suit for specific performance, she had no compensible injury. While she argued that the interest rate differential between the advertised mortgages and the one she finally obtained constituted her damages, the judge rejected the claim as a matter of law, because the actual period she might hold the mortgage was uncertain. Therefore, the total amount of the increased costs she would in fact sustain was considered too speculative to afford a remedy. Moreover, Capano argues that in the first instance it is impossible even to determine if Stephenson would have been eligible for one of the advertised mortgages. As to this latter point, were it not for the false representations made, Capano's silence at a time it had a duty to speak, and its unjustified efforts to renege on the sale of this house, its argument might have had substance. But that is not this case.

#### B.

Delaware law recognizes two measures of damages, both in cases of fraud or deceit and for violations of the Act. *Harman v. Masoneilan International, Inc.,* Del.Supr., 442 A.2d 487 (1982); *Young v. Joyce,* Del. Supr., 351 A.2d 857 (1975); *Poole v. N.V. Deli Maatschappij,* Del.Supr., 224 A.2d 260 (1966); *Nash v. Hoopes,* Del.Super., 332 A.2d 411 (1975). The most common and accepted standard is the benefit of the bargain rule. Under it the plaintiff recovers the difference between the actual and the represented values of the object of the transaction. *Poole,* 224 A.2d at 262; *Nash,* 332 A.2d at 413–14; *Nye Odorless Incinerator Corp. v. Felton,* Del.Super., 162 A. 504, 512 (1931); *Montgomery v. Jacob Brothers Co.,* Del.Super., 159 A. 374, 375 (1931). The aim of this method is to put the plaintiff in the same financial position that he would have been in if the defendant's representations had been true. This goal can also be achieved by awarding the plaintiff the cost of putting the item in the condition in which it was represented to be. *See Young,* 351 A.2d at 859 (cost of repairs).

■ The other rule, applied less frequently, is one that gives the plaintiff the difference between what he paid and the actual value of the item. *Poole,* 224 A.2d at 262; *Mackenzie Oil Co. v. Omar Oil & Gas Co.,* Del.Super., 154 A. 883, 889 (1929), *aff'd sub nom., Phoenix Oil Co. v. Mackenzie Oil Co.,* Del.Supr., 154 A. 894, 902 (1930). This is the out of pocket measure, and is designed to restore the plaintiff to his financial position before the transaction occurred. Each approach has its relative merits, and one may be more suited than the other in a given case.[4] Thus, Delaware law permits the plaintiff to proceed on either theory, but if one is specifically pleaded in the complaint to the exclusion of others, and subject only to the usual rules of amendment, the plaintiff is deemed to have elected his remedy. *Poole,* 224 A.2d at 262. *See generally* W. Prosser, *Law of Torts,* 734–35 (4th ed. 1971).

■ If the fraud is gross, oppressive, or aggravated, or where it involves breach of trust or confidence, the plaintiff may recov-

---

4. The choice may depend on whether the actual value of the item is less or greater than the price paid by the plaintiff. If the plaintiff has made an unfavorable bargain (i.e., actual value is less than the price he paid), the out of pocket measure may be more appropriate. If the plaintiff has paid less than the actual value, the benefit of the bargain rule will provide a more meaningful remedy. *See* D. Dobbs, *Remedies* 595–96 (1973). In any event, the choice must initially be the plaintiff's subject only to such rational and reasonable limitations as are imposed by the circumstances of a given case and the interests of justice.

er punitive damages whether he sues in tort or under the consumer fraud statute. *See Nash,* 332 A.2d at 414. *See also Guthridge v. Pen-Mod, Inc.,* Del.Super., 239 A.2d 709, 715 (1967). The award of punitive damages can not be made unless the plaintiff also receives compensatory damages. *E.g., Bay General Industries, Inc. v. Johnson,* D.C.Ct. App., 418 A.2d 1050 (1980); *Kneas v. Hecht Co.,* Md.Ct.App., 262 A.2d 518 (1970). However, the particular theory upon which the plaintiff is awarded compensatory damages is immaterial, since the two awards further separate interests: compensatory damages attempt to make the plaintiff whole as of a specific time [*e.g., J.J. White, Inc. v. Metropolitan Merchandise Mart, Inc.,* Del.Super., 107 A.2d 892 (1954)], while punitive damages operate to punish the individual defendant and deter similar conduct by others [*e.g., Riegel v. Aastad,* Del.Supr., 272 A.2d 715 (1970)]. The amount of punitive damages should be reasonably proportionate to the actual damages, *Reynolds v. Willis,* Del. Supr., 209 A.2d 760 (1965), but no particular ratio can be fixed in the abstract. *Walczak v. Healy,* Del.Super., 280 A.2d 728 (1971). Instead, the relative size of the awards depends upon the facts of the particular case. *Guthridge,* 239 A.2d at 715.

■ Of course the defendant's liability extends only to any injury to the plaintiff which was within his contemplation when the fraud was committed. *Traylor Engineering & Mfg. Co. v. National Container Corp.,* Del.Super., 70 A.2d 9, 15 (1949); *Dobbs, supra,* at 602; *Prosser, supra,* at 732. A plaintiff, therefore, may recover for any injury resulting from the direct and natural consequences of his acting on the strength of the defendant's statements. *Traylor Engineering & Mfg. Co.,* 70 A.2d at 15. A similar principle applies in actions under the Act. *See Young,* 351 A.2d at 858; *Nash,* 332 A.2d at 413–14.

■ In the context of real estate transactions, interest rate differentials have been awarded as damages for breach of contract and as ancillary relief in actions for specific performance. *Reis v. Sparks,* 547 F.2d 236 (4th Cir.1976) (Maryland law); *Godwin v. Lindbert,* Mich.App., 101 Mich.App. 754, 300 N.W.2d 514 (1981); *Donovan v. Bachstadt,* N.J.Super.A.D., 181 N.J.Super. 367, 437 A.2d 728 (1981), *modified and remanded,* N.J.Supr., 91 N.J. 434, 453 A.2d 160 (1982); *Regan v. Lanze,* N.Y.App.Div., 47 A.D.2d 378, 366 N.Y.S.2d 512 (1975), *rev'd on other grounds,* N.Y.Ct.App., 40 N.Y.2d 475, 387 N.Y.S.2d 79, 354 N.E.2d 818 (1976). The increased financing cost is a predictable consequence of the vendor's delay in completing the transaction. *Reis,* 547 F.2d at 239; *Regan,* 366 N.Y.S.2d at 516. *See Donovan,* 453 A.2d at 167. This approach recognizes the recent trends, noted above, in the relationship between financing terms available and the sale of a particular house. *See Donovan,* 437 A.2d at 730. At the time of this transaction it is conceivable that if the relatively low-interest mortgages were not available, a buyer, who would have to obtain a mortgage with a higher interest rate and possibly a greater down payment, may have found little or no attraction for this property. In the abstract that sounds speculative, but as to this plaintiff, given the facts which Capano is estopped to deny, that situation is very real. She consistently made known her desire to buy this house because of the favorable mortgage terms Capano said were available. Under such circumstances the increased financing costs to this plaintiff are recoverable, since they are a direct and proximate result of Capano's misrepresentations. It follows that the Superior Court erred in concluding that Stephenson had not suffered actual damages, and the case must be remanded for a determination of those damages consistent with this opinion.

C.

To calculate the additional financing costs, Stephenson urges a straight comparison between the mortgages advertised by Capano and the one that she actually obtained at greater cost in September 1981. We need not decide a precise formula, except to hold that the plaintiff is entitled to

**1078**

recover all damages which are a direct and proximate result of the false advertising. That is a factual issue to be considered and determined by the trial court on remand.

Capano has consistently argued that damages based on an interest rate differential are speculative, since Stephenson may sell the townhouse or refinance the mortgage. This position ignores the general rule that the mere difficulty or lack of certainty in calculating the amount of damages does not prevent an award to the successful party. *See* 22 Am.Jur.2d *Damages* §§ 23, 25 (1965). The evidence must only establish with "reasonable probability" the nature and extent of future injury. *See Drozdov v. Webster,* Del.Supr., 345 A.2d 895, 896 (1975); *Donovan,* 437 A.2d at 731–32. While Capano's concern is legitimate, since Stephenson should not be entitled to a sheer windfall, the trial court may take into consideration all relevant factors. If the proof justifies it, the court may weigh the probability that a person, who financed his purchase of a Capano townhouse with one of the advertised mortgages, would either refinance the mortgage or sell the house before the mortgage had run its full term. *Donovan,* 437 A.2d at 733. Similarly, the trial court may take into account any facts or circumstances supporting a reasonable probability that this plaintiff will either refinance her present mortgage or sell the house before that mortgage's term expires. Of course, any award of future damages must be reduced to present value. *Id.*

██ For the guidance of the court on remand, we note that the Superior Court must award costs to the prevailing party, i.e., Stephenson. 10 *Del.C.* § 5101; Super. Ct.Civ.R. 54(d). However, attorney's fees, as requested by Stephenson, are not generally recoverable unless there is a specific statutory authorization for such an award. *E.g., Walsh v. Hotel Corp. of America,* Del. Supr., 231 A.2d 458 (1967). In contrast to the clear statement in the Uniform Deceptive Trade Practices Act that attorney's fees may be granted to the prevailing party [6 *Del.C.* § 2533(b)], the Act is silent, and

we conclude that attorney's fees may not be awarded thereunder.

\*   \*   \*

REVERSED AND REMANDED.