**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 15-3888
_____

JOHN HARNISH; JUSTIN SCHLUTH;
ROBERT KLEIN; GREGORY EMOND;
AYLA O'BRIEN KRAVITZ; CHRISTINA MARINAKIS,
                                    Appellants

v.

WIDENER UNIVERSITY SCHOOL OF LAW
_____

On Appeal from the United States District Court for the
District of New Jersey
(D.C. Civil No. 2-12-cv-00608)
District Judge:  Hon. William H. Walls
_____

Argued June 6, 2016

Before:  CHAGARES, KRAUSE, and BARRY, <u>Circuit
Judges</u>.

(Filed: August 16, 2016)

Danielle F. Moriber, Esq.
Rachel E. Simon, Esq.
David S. Stone, Esq. (Argued)
Stone & Magnanini
100 Connell Drive, Suite 2200
Berkeley Heights, NJ 07922
        Attorneys for Appellants

Suna Lee, I, Esq.
Thomas F. Quinn, Esq. (Argued)

Wilson, Elser, Moskowitz, Edelman & Dicker
200 Campus Drive, 4th Floor
Florham Park, NJ 07932

Dennis J. Drasco, Esq.
Lum Drasco & Positan
103 Eisenhower Parkway
Roseland, NJ 07068
        Attorneys for Appellee

————————————

OPINION

————————————

CHAGARES, Circuit Judge.

This is an interlocutory appeal of a denial of class certification in a suit alleging that Widener University School of Law defrauded a putative class of law students by publishing misleading statistics about its graduates' employment, which caused the students to pay "inflated" tuition. The District Court found, among other things, that the plaintiffs failed to meet the requirement in Rule 23(b)(3) of the Federal Rules of Civil Procedure that common questions predominate over individual questions in order for a class to be certified. We conclude that, although the District Court labored under a few misconceptions about the plaintiffs' theory of the case, the errors were harmless and the court ultimately reached the correct result. Even when properly characterized, the plaintiffs' theory is insufficiently supported by class-wide evidence, and therefore the plaintiffs have not established that common questions will predominate. For that reason, we will affirm.

I.

Named plaintiffs John Harnish, Justin Schluth, Robert Klein, Gregory Emond, Ayla O'Brien Kravitz, and Christina Marinakis are graduates of Widener University School of Law ("Widener"), a private law school with campuses in Harrisburg, Pennsylvania, and Wilmington, Delaware, who graduated from Widener between 2008 and 2011. In a complaint filed in the United States District Court for the

2

District of New Jersey on February 1, 2012, and amended on April 27, 2012, they claim that Widener violated the New Jersey Consumer Fraud Act ("NJCFA") and the Delaware Consumer Fraud Act ("DCFA") by intentionally publishing and marketing misleading statistics about the employment of its graduates.

Specifically, they allege the following. Between 2005 and 2011, Widener reported that 90-97% of its students were employed after graduation. These numbers were widely and deliberately advertised in print and online publications, along with oral presentations, targeting prospective students. But in reality, only 50-70% of Widener graduates ended up in full-time legal positions, which Widener knew. The school was including non-legal and part-time positions in its published statistics without reporting the breakdown. When Widener did provide a breakdown in its materials, it was a breakdown by employer type (private firm, business and industry, etc.) within the category of full-time legal employment, further misleading prospective students into believing that the 90-97% number represented full-time legal employment. Beginning in 2011, Widener improved its reporting somewhat, by including a breakdown that distinguished between full-time legal positions and other jobs. But, according to the plaintiffs, Widener continued to gather information about its graduates in a manner that distorted the statistics by, for example, crediting unreliable secondhand accounts of graduates' employment and avoiding responses from unemployed graduates.

The plaintiffs claim that publishing misleading employment statistics enabled Widener to charge its students "inflated" tuition — that is, higher tuition than what Widener would have received if full and accurate statistics were published instead. Joint Appendix ("J.A.") 90 (Amended Compl. ¶ 1). And they seek damages equal to the amount of tuition that students allegedly overpaid. Widener moved to dismiss the case, but the motion was denied on March 20, 2013. The parties then engaged in discovery related to class certification.

On February 2, 2015, the plaintiffs moved to certify a class of "[a]ll persons who enrolled in Widener University

3

School of Law and were charged full or part-time tuition within the statutory period for the six-year period prior to the date the Complaint in this action was filed through the date that this Class is certified." J.A. 210. A disputed issue regarding class certification was whether the plaintiffs could prove in class-wide fashion that all the class members suffered damages as a result of Widener's actions. In addressing this issue, the plaintiffs introduced a report of economics expert Dr. Donald Martin. Dr. Martin attested that he would be able to estimate the extent to which Widener's misleading statistics inflated the tuition, which could serve as a class-wide estimate of every class member's damages, insofar as every class member, by definition, paid tuition. In order to arrive at his estimate, he would perform a regression analysis of 64 private law schools' published tuition and employment statistics and, by controlling for other variables, compute how much lower Widener's tuition would be expected to be if full and accurate employment statistics were published instead. Noting that further discovery was forthcoming and complete data was unavailable, Dr. Martin did not provide a final estimate of class-wide damages. He did, however, conclude that there was a statistically significant relationship between employment rates and tuition prices across the 64 schools and that his regression methodology would be a reliable means of arriving at a final estimate of class-wide damages.

On July 1, 2015, the District Court denied class certification on two grounds. First, it found that the plaintiffs could not meet Federal Rule of Civil Procedure 23(b)(3)'s requirement that common questions "predominate" over individual questions because they had "not shown that they c[ould] prove the proposed class members' damages by common evidence." J.A. 13. The District Court rejected Dr. Martin's proposed class-wide method of proving damages, pointing to the variation in class members' employment outcomes: some Widener graduates did obtain full-time legal jobs, and so their damages, if any, would be different from those of graduates who did not. The District Court also concluded that the proposed class-wide theory of damages relied on a "fraud-on-the-market" theory, which New Jersey courts had rejected outside the federal securities fraud context.

4

Second, the District Court found that the plaintiffs could not meet Rule 23(a)(3)'s requirement that the named plaintiffs' claims be "typical" of the claims of the proposed class. Because the plaintiffs sought to certify a class of students enrolled "through the date this Class is certified," the class would include students who enrolled in 2012 and beyond, after Widener had improved its reporting. This, according to the District Court, would render the named plaintiffs atypical in relation to large portions of the class because there would be different factual circumstances for the post-2011 enrollees. It also found that some class members might even have different interests than the named plaintiffs, insofar as those pursuing legal careers might prefer not to have Widener's reputation tarnished by the lawsuit.

The plaintiffs filed a timely petition for interlocutory review under Federal Rule of Civil Procedure 23(f), which we granted.

## II.

The District Court exercised jurisdiction under 28 U.S.C. § 1332. We have appellate jurisdiction under 28 U.S.C. § 1292(e) and Federal Rule of Civil Procedure 23(f). "We review a class certification order for abuse of discretion, which occurs if the district court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact." Neale v. Volvo Cars of N. Am., LLC, 794 F.3d 353, 358 (3d Cir. 2015) (quotation marks omitted).

## III.

The plaintiffs raise three challenges to the District Court's finding that Rule 23(b)(3)'s predominance requirement was not met. We will address each challenge in turn and, for the reasons set forth below, affirm the District Court's denial of class certification.

## A.

5

The plaintiffs' first argument is that the District Court applied an improperly burdensome legal standard under Rule 23(b)(3) by scrutinizing their class-wide evidence prior to full merits discovery and demanding that they "conclusively prove class-wide damages." Pls.' Br. 36. They contend that the predominance inquiry should be "entirely divorced from the validity of [their] claims" and that the District Court was limited to assessing the "viab[ility]" of their theory, not its "valid[ity]." Id. at 35-36. We disagree.

A plaintiff "may not merely propose a method of [meeting Rule 23's requirements] without any evidentiary support." Carrera v. Bayer Corp., 727 F.3d 300, 306 (3d Cir. 2013). And trial courts "must engage in a rigorous analysis and find each of Rule 23[ ]'s requirements met by a preponderance of the evidence before granting certification." Hayes v. Wal-Mart Stores, Inc., 725 F.3d 349, 358 (3d Cir. 2013) (citations and quotation marks omitted). They must do so even if it involves judging credibility, weighing evidence, or deciding issues that overlap with the merits of a plaintiff's claims. In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 316-25 (3d Cir. 2008).

We have observed that "[t]he predominance inquiry is especially dependent upon the merits of a plaintiff's claim, since the nature of the evidence that will suffice to resolve a question determines whether the question is common or individual." In re Constar Int'l Inc. Sec. Litig., 585 F.3d 774, 780 (3d Cir. 2009) (quotation marks omitted). "[B]efore a class is certified under [Rule 23(b)(3)], a district court must find that 'questions of law or fact common to class members predominate over any questions affecting only individual members.'" Tyson Foods, Inc. v. Bouaphakeo, 136 S. Ct. 1036, 1045 (2016) (quoting Fed. R. Civ. P. 23(b)(3)). As defined by the Supreme Court, "[a]n individual question is one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof." Id. (quotation marks omitted). Rule 23(b)(3) requires that "the common, aggregation-enabling, issues in the case [be] more

prevalent or important than the non-common, aggregation-defeating, individual issues." Id. (quotation marks omitted).

In determining whether issues that are "susceptible to generalized, class-wide proof" are "more prevalent or important," id., a district court is called to "formulate some prediction as to how specific issues will play out . . . in a given case," Hydrogen, 552 F.3d at 311. The court cannot rely on a mere "threshold showing" that a proposed class-wide method of proof is "plausible in theory." Id. at 321, 325. Rather, the court's Rule 23(b)(3) finding necessarily entails some analysis of whether the proposed class-wide evidence will actually be sufficient for the class to prevail on the predominant issues in the case. If class-wide evidence is lacking, the court cannot be adequately assured that individualized evidence will not later overwhelm the case and render it unsuitable for class-wide adjudication. This analysis will often resemble a merits determination, in that it relates to plaintiffs' ability to prove the elements of their claims.

But the analysis is not a merits determination. First, much like a court's preview of the merits of a case when imposing a preliminary injunction, "the district court's findings for the purpose of class certification are conclusive on that topic" but "do not bind the fact-finder on the merits." Id. at 318 & n.19. Second, a court should not address merits-related issues "beyond what is necessary to determine preliminarily whether certain elements will necessitate individual or common proof." Sullivan v. DB Invs., Inc., 667 F.3d 273, 305 (3d Cir. 2011) (en banc). In certain situations, it may be unnecessary to analyze the class-wide evidence as to every issue in the case in order to reach a conclusion about Rule 23(b)(3). For example, if the court decides that the central, predominant issues in the case are common, then Rule 23(b)(3) is met despite the possibility that some subsidiary issues will require individualized evidence. Tyson, 136 S. Ct. at 1045. Further, evidence as to an issue or element need not be produced at class certification where the very nature of the issue or element guarantees that all class members' claims will "prevail or fail in unison," and therefore there is "no risk whatever that a failure of proof on the common question . . . will result in individual questions

7

predominating." Amgen Inc. v. Conn. Ret. Plans & Trust Funds, 133 S. Ct. 1184, 1191, 1196 (2013).

Thus, the task for the District Court was to determine whether the plaintiffs' proposed class-wide theories and evidence would be sufficient to address the predominant issues in the case. The issues in the case are defined by the elements of a NJCFA/DCFA claim, which are: "(1) an unlawful practice, (2) an ascertainable loss, and (3) a causal relationship between the unlawful conduct and the ascertainable loss." Gonzalez v. Wilshire Credit Corp., 25 A.3d 1103, 1115 (N.J. 2011) (quotation marks omitted); accord Teamsters Local 237 Welfare Fund v. AstraZeneca Pharm. LP, 136 A.3d 688, 693 (Del. 2016).[1]

The plaintiffs criticize the District Court's focus on "damages," and they invoke the general rule that "individual damages calculations do not preclude class certification under Rule 23(b)(3)." Neale, 794 F.3d at 375. But the plaintiffs gloss over the fact that when courts speak of "damages," they are often referring to two distinct concepts: the "fact of damage" and the measure/amount of damages. The fact of damage, often synonymous with "injury" or "impact," is frequently an element of liability requiring plaintiffs to prove that they have suffered some harm traceable to the defendant's conduct — in other words, the "ascertainable loss" and "causal relationship" requirements under the NJCFA and the DCFA. See Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 187-89 (3d Cir. 2001); In re Ins. Brokerage Antitrust Litig., 579 F.3d 241, 269 (3d Cir. 2009); In re Scrap Metal Antitrust Litig., 527 F.3d 517, 535-36 (6th Cir. 2008); In re New Motor Vehicles Canadian Exp. Antitrust Litig., 522 F.3d 6, 19 n.18, 28 (1st Cir. 2008). Only if the fact of damage is established does a court reach the question of remedy and the exact calculation of each plaintiff's damages. "While obstacles to calculating damages may not preclude class certification, the putative class must

---

[1] The parties have stipulated that there are no material differences between New Jersey and Delaware law concerning the issues in this case. Where appropriate, we have cited law from both states, but the majority of the authority comes from the New Jersey courts.

8

first demonstrate economic loss" — that is, the fact of damage — "on a common basis." Newton, 259 F.3d at 189.

We are confident that, in scrutinizing the plaintiffs' proposed class-wide theory and evidence of damages, the District Court was concerned not merely with the plaintiffs' ability to calculate the precise measure of damages, but rather with their ability to demonstrate the fact of damage — "ascertainable loss" and a "causal relationship" — class-wide. Ascertainable loss and a causal relationship being core elements of liability under the NJCFA and the DCFA, it was entirely appropriate for the District Court to examine the plaintiffs' theory of damages and the proof supporting it.

As to the plaintiffs' general objection to the level of scrutiny that the District Court applied to their class-wide evidence, we see no indication that the District Court applied the wrong legal standard. For the reasons already elaborated, closely scrutinizing the plaintiffs' proposed class-wide method of proof was the District Court's duty under Rule 23 and did not, as the plaintiffs argue, transform the court's decision into a premature merits determination. Nor did the District Court purport to be deciding the merits of the case "conclusively," as the plaintiffs now assert. The District Court's analysis of the evidence was in service of predicting whether the class-wide proof would ultimately suffice, which it was required to do. And whatever distinction the plaintiffs are attempting to draw between "viable" class-wide proof and "valid" class-wide proof, the law is clear that a class-wide method of proof must be more than "plausible in theory" and that a district court is to consider "all relevant evidence and arguments" in predicting whether the class-wide proof will suffice. Hydrogen, 552 F.3d at 325. Whether the District Court reached the correct conclusion after considering the evidence and arguments is a separate issue that we will address below.

B.

Next, the plaintiffs argue that the District Court erroneously attributed significance to the fact that some Widener graduates do obtain full-time legal employment (meaning that some class members suffered little, if any,

9

damage to their career prospects), effectively ignoring that the plaintiffs' theory of damages is unrelated to class members' actual employment outcomes. In other words, they argue that the District Court injected an individualized question (employment outcomes) that has never been at issue because they claim damages only in the form of overpaid tuition, which is common to all Widener graduates regardless of their employment outcomes. While we agree that class members' own individual employment outcomes are not at issue in this case, we conclude that the error was harmless because, as discussed in a later portion of this opinion, the inflated-tuition theory of damages that is at issue has not been adequately supported by class-wide evidence, which precludes class certification under Rule 23(b)(3).

It is apparent that the plaintiffs' proposed theory of the case does not involve an assessment of class members' own individual employment outcomes — a point that Widener appears to concede. Although the amended complaint does request "damages" in general language, in several places it frames the damages in terms of "inflated tuition." J.A. 116-22. The plaintiffs also made clear in their brief in support of class certification that inflated tuition was their sole proposed theory of damages. And they have done so in their briefing before us.

Further, in the abstract, we perceive no conceptual problem with the plaintiffs' proposed theory. The NJCFA and the DCFA both contemplate so-called "out-of-pocket" damages. Under the out-of-pocket rule, a plaintiff's damages are "the difference between the price paid and the actual value of the property acquired." Romano v. Galaxy Toyota, 945 A.2d 49, 57 (N.J. Super. Ct. App. Div. 2008); accord Stephenson v. Capano Dev., Inc., 462 A.2d 1069, 1076 (Del. 1983). That is exactly what the plaintiffs are seeking. Pls.' Br. 17-18 ("Plaintiffs seek the difference between the tuition that students paid and tuition that they would have paid in the absence of Widener's misleading marketing . . . ."); 24-25 ("The only loss Plaintiffs seek to recover is the incremental difference between the amount of tuition that Widener could have charged but for its fraudulent mass-marketing scheme and the tuition it actually charged.").

10

Neither the "price paid" nor the "actual value" depends on class members' own individual employment outcomes. For the price paid, that is self-evident. For the actual value, it is less obvious. Actual value in a fraud case is generally "determined as of the time of the transaction." Kaufman v. Mellon Nat'l Bank & Trust Co., 366 F.2d 326, 331 (3d Cir. 1966) (applying Pennsylvania law); Sands v. Forrest, 434 A.2d 122, 124 (Pa. Super. Ct. 1981) ("[I]n an action for fraud and deceit the measure of damages is the difference in value between the real, or market, value of the property at the time of the transaction and the higher, or fictitious, value which the buyer was induced to pay for it.").[2] In the fraud context, the actual value of a degree program therefore does not depend on a student's own individual post-graduation employment outcome, because no one knows at the time of enrollment what that outcome will be. Some students will ultimately obtain full-time legal jobs after graduation while others will not, but at the time of enrollment, the Widener degree offers them a particular probability of full-time legal employment. It is the time-of-enrollment probability of full-time legal employment (which the then-available aggregate employment statistics help to predict), rather than an individual student's own future employment outcome, that affects the true/actual market value of a Widener education.[3]

The plaintiffs' theory is therefore that, irrespective of what ultimately happened to class members after graduation, the actual value of their Widener education depended in part

---

[2] To the extent that the "market" price at the time of the transaction might itself be inflated due to widespread dissemination of the misrepresentation, one must ascertain the fair price that would be paid if the broader market knew the truth. See Restatement (Second) of Torts § 549 cmt. c.

[3] As a loose analogy, a lottery ticket's actual value at sale does not retroactively plummet to zero the moment a purchaser loses or skyrocket the moment a purchaser wins. If the odds were honestly presented, all purchasers received exactly what they paid for, and neither a loser nor a winner could claim any damages. And if the odds were misrepresented, both players would have the same damages arising from the fraud — namely, they were overcharged for placing their bets.

on the probability of full-time legal employment that they faced when enrolling. Thus, all class members ended up paying more than Widener's actual value because the published employment statistics (the key indicators of the probability of full-time legal employment) were misleadingly optimistic in comparison to the reality of the situation.

We suspect that when it noted the significance of varying individual employment outcomes, the District Court may have had in mind a different theory of damages known as the "benefit-of-the-bargain" rule, which is also available under the NJCFA and the DCFA. Under this rule, a plaintiff can claim damages "equal to that which [the] plaintiff would have received had the representation been true," Finderne Mgmt. Co. v. Barrett, 955 A.2d 940, 957 (N.J. Super. Ct. App. Div. 2008) (quotation marks omitted), sometimes also referred to as the "replacement cost," "replacement value," or the "diminution" or "loss in value" from the purchaser's "expectation interest," Lee v. Carter-Reed Co., 4 A.3d 561, 576 (N.J. 2010); Thiedemann v. Mercedes-Benz USA, LLC, 872 A.2d 783, 789, 792 (N.J. 2005); Furst v. Einstein Moomjy, Inc., 860 A.2d 435, 440-42 (N.J. 2004); accord Stephenson, 462 A.2d at 1076. The District Court noted that some Widener students "actually got the advertised jobs" — saying, in effect, that they got what they were promised (a benefit-of-the-bargain perspective), rather than that they got something worth what they paid (an out-of-pocket perspective). J.A. 60. If full-time legal employment post-graduation was in fact the "advertised" benefit of the bargain, then employment outcomes would be relevant to benefit-of-the-bargain damages. But we are skeptical of the notion that Widener was guaranteeing any particular employment outcome. More likely, the represented value of a Widener education to a particular student, like its actual value, is a function of the probabilistic career-advancing potential of the education (as claimed, in the case of represented value, versus as truly existing, in the case of actual value), irrespective of whether that individual student ultimately realizes the potential.

In any event, we do not understand the plaintiffs to be seeking benefit-of-the-bargain damages. Although the plaintiffs have not explicitly invoked the out-of-pocket rule

12

rather than the benefit-of-the-bargain rule and have cited cases involving both rules, they describe the damages they seek in out-of-pocket terms. So even if class members' own individual employment outcomes would be relevant to determining the represented value of the bargain, they are not relevant to this case.

In this respect, the District Court appears to have mischaracterized the plaintiffs' theory of damages and thereby incorporated an individualized issue that was irrelevant to the case before it. Further, we cannot agree with Widener that the District Court's discussion of class members' differing employment outcomes was a mere aside that had no impact on the court's analysis. The District Court clearly attributed some significance to the individual employment outcomes.

We conclude, however, that the mischaracterization was harmless because the District Court would very likely have reached the same decision regarding Rule 23(b)(3)'s predominance requirement despite the mischaracterization. Eliminating any focus on class members' actual employment outcomes would have removed one individualized inquiry. But even when the plaintiffs' inflated-tuition theory is properly understood, the crucial overarching issue in the case — proving that each class member suffered damages as a result of Widener's actions — still must be shown to be susceptible to class-wide proof. We now turn to that issue.[4]

C.

Finally, the plaintiffs argue that the District Court erred in equating their theory with the non-cognizable,

---

[4] The plaintiffs contend that the District Court not only mischaracterized their theory of damages but also, in doing so, violated the law-of-the-case doctrine, because the court, in its earlier decision denying Widener's motion to dismiss, had deemed class members' own individual employment outcomes to be irrelevant to the plaintiffs' case. Having already concluded that the District Court's discussion of class members' employment outcomes was erroneous but harmless, we have no need to address this argument.

reliance-based "fraud-on-the-market" theory, and contend that they have sufficient class-wide evidence to support a non-reliance-based inflated-tuition theory. The plaintiffs are correct that "fraud on the market" is not quite the proper label for their theory, and correct that they are free to pursue non-reliance-based theories of damages. But among non-reliance-based theories, the plaintiffs' chosen inflated-tuition theory — whatever might be said about its plausibility — belongs to the "price-inflation" species that, like the fraud-on-the-market theory, has been rejected by the New Jersey and Delaware courts outside the federal securities fraud context. We therefore reach the same conclusion as the District Court, despite employing slightly different terminology: the plaintiffs fail to meet the predominance requirement of Rule 23(b)(3) because the only class-wide evidence of damages that they offer supports a non-cognizable theory.

As discussed above, the plaintiffs appear to be pursuing out-of-pocket damages, claiming that Widener's misrepresentations caused them to pay more for their education than it was truly worth. Under this theory, we look to the injuries that resulted from the defendant's having made the misrepresentation in the first place, and the goal is to return the plaintiffs to the position that they would have occupied if the misrepresentation had never been made. See, e.g., Stephenson, 462 A.2d at 1076; Restatement (Second) of Torts § 549 cmt. g (1977); Michael B. Kelly, The Phantom Reliance Interest in Tort Damages, 38 SAN DIEGO L. REV. 169, 171-76 (2001).[5] In an ordinary fraud case, this would

---

[5] A benefit-of-the-bargain claim, by contrast, is contract-like. We look to the injuries that resulted from the defendant's having not lived up to the misrepresentation, and the goal is to place the plaintiffs in the position that they would occupy if the misrepresentation were true. See Furst, 860 A.2d at 441-42; Stephenson, 462 A.2d at 1076; Smajlaj v. Campbell Soup Co., 782 F. Supp. 2d 84, 101-02 (D.N.J. 2011); Kelly, supra, at 171-76. We do not interpret the plaintiffs' argument as a benefit-of-the-bargain claim because the success of such a claim would not depend on proving that the misrepresentation caused higher purchase prices. A benefit-of-the-bargain class action logically does not entail proving that all class members were induced to pay extra (a

14

require the plaintiffs to prove that the misrepresentation entered their decision-making and induced them to pay more for something than they would have otherwise — in other words, prove reliance. But the plaintiffs do not purport to have class-wide proof of reliance, in the traditional sense, on the part of every single class member. Nor could they; reliance is nearly always an individualized question, requiring case-by-case determinations of what effect, if any, the misrepresentation had on plaintiffs' decision-making.[6]

reliance-based theory) or even that the defendant was empowered to charge them all extra (the price-inflation theory that the plaintiffs have unsuccessfully pursued in this case, discussed infra). Instead, it entails proving that class members all reasonably expected more from the bargain than what they received. Marcus v. BMW of N. Am., LLC, 687 F.3d 583, 607-08 (3d Cir. 2012); Smajlaj, 782 F. Supp. 2d at 99-100.

[6] For example, where "a plaintiff cannot invoke the fraud-on-the-market presumption" in a securities fraud case, "[s]he can . . . attempt to establish reliance through the traditional mode of demonstrating that she was personally aware of [the defendant's] statement and engaged in a relevant transaction . . . based on that specific misrepresentation," but "[i]ndividualized reliance issues would predominate in such a lawsuit." Amgen, 133 S. Ct. at 1199 (quotation marks omitted).

Without the aid of the broad presumption afforded by the fraud-on-the-market theory, plaintiffs will rarely be able to prove in class-wide fashion that all class members relied on misrepresentations and were induced to pay more for something than they would have otherwise. In Lee, the New Jersey Supreme Court recognized that, where there are extraordinary facts involving a "worthless product" about which "all the representations . . . are baseless," "a trier of fact may fairly infer that a[ll] consumer[s] purchasing the product w[ere] influenced, in some way or other, by the false-marketing scheme." Lee, 4 A.3d at 580 (emphasis added). But the court also recognized that, in the absence of such a situation, determining whether each "purchaser bought the product based on a fictional or real benefit" — here, the misleading employment statistics versus Widener's many other real attributes — remains "a perplexing problem, the

15

The District Court appears to have believed that the plaintiffs were attempting to prove reliance class-wide by way of the "fraud-on-the-market" presumption. It likely believed so because the goal of Dr. Martin's analysis was to prove that the market that determines law school tuition prices is an "efficient" market, meaning a market in which price responds to publicly available information about the value of the product. But an "efficient-market" theory and a "fraud-on-the-market" theory are not the same, even though, as shorthand, courts sometimes use the terms interchangeably.

The connection between the two terms comes from the federal securities fraud context, where courts will often find an efficient market to exist, in which "information important to reasonable investors . . . is immediately incorporated into stock prices." In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1425 (3d Cir. 1997). Once a securities market is found to be efficient, the fraud-on-the-market theory employs the efficient-market finding as the "intellectual underpinning" for why individualized proof of reliance is not required. Kaufman v. i-Stat Corp., 754 A.2d 1188, 1198 (N.J. 2000). The theory "'is based on the hypothesis that, in an open and developed securities market, . . . [m]isleading statements will . . . defraud purchasers of stock even if the purchasers do not directly rely on the misstatements.'" Basic Inc. v. Levinson, 485 U.S. 224, 241-42 (1988) (quoting Peil v. Speiser, 806 F.2d 1154, 1160 (3d Cir. 1986)). As we have explained in greater detail:

> The fraud-on-the-market theory creates a threefold presumption of indirect reliance. First, [per an efficient-market finding,] this court presumes that the misrepresentation affected the market price. Second, it presumes that a purchaser did in fact rely on the price of the stock as indicative of its value. Third, it presumes the reasonableness of that reliance. All of these presumptions are necessary to establish actual reliance. The first presumption is necessary to find that a misrepresentation was

resolution of which would depend on a number of individual inquiries." Id. at 579.

16

in fact made to the purchaser. Thus, if defendant rebuts this presumption by showing that the market did not respond to the misrepresentation, it does no more than show that the market price was not misrepresentative, and thus that no misrepresentation was made to the purchaser of the stock. The second presumption is necessary for a court to find that the plaintiff did in fact rely on the misrepresentation. Thus, a defendant may rebut this presumption by showing that the plaintiff would have purchased even if he had known about the misrepresentation. The final presumption, that reliance on the market price is reasonable, may be rebutted by showing that the plaintiff knows that a representation is false.

Zlotnick v. TIE Commc'ns, 836 F.2d 818, 822 (3d Cir. 1988) (emphasis added); see also Peil, 806 F.2d at 1161.

Plaintiffs who claim that a market is efficient, accordingly, may try to invoke the fraud-on-the-market presumption, because an efficient market is a precondition of the fraud-on-the-market theory. But some plaintiffs, including the plaintiffs in this case, may have other reasons for claiming that a market is efficient.[7] Although the District Court was correct that the New Jersey courts have declined to extend the fraud-on-the-market presumption beyond the federal securities fraud context, Kaufman, 754 A.2d at 1200-01, that was beside the point because the plaintiffs have not

---

[7] At one point in their briefing, the plaintiffs muddy the waters by appearing to disclaim even an efficient-market theory. They argue that "the inquiry is not whether Widener's tuition responded to employment data, but what Widener's tuition would have been absent its fraudulent marketing scheme." Reply Br. 17 n.8. But that sentence is incoherent and incompatible with the thrust of their argument. They cannot claim that tuition would have been different "absent [a] fraudulent marketing scheme" involving employment data unless they also believe that "tuition respond[s] to employment data."

17

quite invoked the fraud-on-the-market presumption.[8] The plaintiffs do not and need not argue the fraud-on-the-market theory because, as they rightly point out, the NJCFA and the DCFA do not require reliance on a misrepresentation in order to establish a "causal relationship" between that misrepresentation and an "ascertainable loss," and other non-reliance forms of "causal relationship" (under a "proximate cause" standard) are permissible. Marcus v. BMW of N. Am., LLC, 687 F.3d 583, 606 (3d Cir. 2012); Lee, 4 A.3d at 576, 580; AstraZeneca, 136 A.3d at 693-94. See generally supra note 5 (discussing benefit-of-the-bargain claims); John C. P. Goldberg et al., The Place of Reliance in Fraud, 48 ARIZ. L. REV. 1001, 1004-14 (2006) (discussing examples of how causation can still exist when reliance is lacking). What the plaintiffs seek to establish is the existence of an efficient market for law school tuition — which is a prerequisite to, rather than an element established by, a fraud-on-the-market argument.

The plaintiffs have placed market efficiency at issue by citing Dr. Martin's analysis suggesting that tuition at Widener and elsewhere responds to public information, including employment statistics. In that respect, the District Court's analysis was correct. But the plaintiffs do so not to benefit from a presumption of reliance but rather for the purpose of supporting their theory of "price inflation." Given their out-of-pocket damages claim, the plaintiffs must prove that Widener's publication of misleading employment statistics worsened all class members' positions, by causing them to pay more for something than it was worth. The existence of an efficient market, they argue, would permit them to prove that all class members' positions were worsened by the publication of misleading employment statistics because Widener, as an efficient-market actor responding to those statistics, charged everyone higher tuition, regardless of whether the statistics impacted each individual class member's decision-making as a consumer.

---

[8] As with the District Court's mischaracterization of the relevance of class members' own individual employment outcomes, we are confident that the misapplied "fraud-on-the-market" label was harmless and that the District Court's concerns about the plaintiffs' class-wide proof were valid.

That is, rather than proving that the misrepresentations induced each class member to pay more, they propose to prove that the misrepresentations empowered Widener to charge more across the entire market.

There is some plausibility to this theory, insofar as law schools operate in a largely fixed-price market, not an auction-style market with individually matched asks and bids. Widener does not ask around to determine the highest price that it can charge each prospective student. One would imagine that Widener guesses the wisest across-the-board tuition to charge based on a reading of the market and a self-assessment of how prospective students, as a whole, perceive the school, including its employment statistics.[9] It arguably does not matter that some prospective students might be entirely unaware of or unconcerned by Widener's employment statistics (and, if they were bidders in an auction-style market, would not change their bids in response to different employment statistics). The point is that Widener might be expected to anticipate greater student demand in response to misleading employment statistics and thus to charge all students a higher price than it would have if it had published full and accurate statistics instead.

The problem for the plaintiffs is that the state courts have held that the ascertainable-loss and causal-relationship elements of the NJCFA and the DCFA are not met by the kind of price-inflation theory discussed above and advanced by the plaintiffs. In International Union of Operating Engineers Local No. 68 Welfare Fund v. Merck & Co., 929 A.2d 1076 (N.J. 2007) (per curiam), the New Jersey Supreme Court rejected the plaintiff's attempt "to prove only that the price charged for Vioxx was higher than it should have been as a result of defendant's fraudulent marketing campaign, and . . . thereby to be relieved of the usual requirements [of] prov[ing] an ascertainable loss." Id. at 1088. The court's "rejection of the theoretical basis for that proof mechanism remove[d] it as a potential common question entirely," and thus individualized questions about how the "diverse group"

---

[9] Financial aid packages are, of course, a means of customizing the price somewhat to respond to individual students' price thresholds.

19

of class members reacted to the alleged fraud predominated instead and precluded class certification.  Id. at 1087, 1088; see also Dabush v. Mercedes-Benz USA, LLC, 874 A.2d 1110, 1121 (N.J. Super. Ct. App. Div. 2005); N.J. Citizen Action v. Schering-Plough Corp., 842 A.2d 174, 178-79 (N.J. Super. Ct. App. Div. 2003).  Similarly, in AstraZeneca, the Delaware Supreme Court rejected the plaintiffs' attempt to establish damages based on the mere fact that they "would have paid a lower 'market' price if all [market] participants had been fully informed."  AstraZeneca, 136 A.3d at 696-97.  What mattered instead was that the plaintiffs themselves were fully informed that the advertising was misleading.  Id.

The state courts, like the District Court in this case, have emphasized that recognizing "price inflation" as a "cause" of "ascertainable loss" is essentially the same as extending the fraud-on-the-market presumption to all consumer-fraud cases.  The practical effect of both theories is indeed the same, and both depend on the existence of an efficient market.  There is a conceptual difference between a "fraud-on-the-market" theory and a "price-inflation" theory — the former deems a price to be a representation and presumes that buyers relied on it, whereas the latter sidesteps reliance altogether.  The distinction, however, is immaterial because the state courts have refused to recognize either theory outside the federal securities fraud context.[10]

---

[10] Even if a price-inflation theory were cognizable under state law, the plaintiffs would still be required to do more than propose it as an economically plausible theory; they would need to provide proof that price inflation actually occurred on this occasion, as a result of the specific misrepresentation at issue.  We have serious doubts about whether they could do so.  They offer no direct evidence that Widener changed its prices in response to the employment statistics that it published and their anticipated effect on the overall market.  It appears that the plaintiffs did at one point seek discovery of "[a]ny information related to Widener's strategies, methodologies, policies, and procedures regarding the setting of Widener's tuition prices," to which Widener objected.  D.C. Dkt. No. 59, at 10, 12.  But it is the plaintiffs' burden to build a record to support class certification, and they did not pursue the discovery issue below or on appeal.

20

The plaintiffs have therefore failed to propose a cognizable theory of damages that is sufficiently supported by class-wide evidence. And because the fact of damages (an "ascertainable loss" having a "causal relationship" with Widener's conduct) is a crucial issue in the case, the inability to resolve it in class-wide fashion will cause individual questions to predominate over common ones, which precludes class certification.[11]

---

All we have is Dr. Martin's analysis of data from 64 private law schools and his preliminary estimate of the dollar amount by which "average tuition costs" rose across that 64-school sample for each "percentage point increase in reported employment." J.A. 341. The plaintiffs would therefore have the fact-finder infer that because tuition prices across 64 private law schools tend to vary with employment statistics, Widener's tuition price was influenced by its employment statistics on this occasion. Cf. Tyson, 136 S. Ct. at 1046, 1048 (observing that "statistical evidence . . . is a permissible method of proving classwide liability . . . [if] each class member could have relied on th[e] sample to establish liability if he or she had brought an individual action" but that statistical evidence would not suffice if the class members "were not similarly situated").

According to Dr. Martin, his regression equation represents the best possible fit for all the data from 64 schools, and we have no reason to think otherwise. But that strikes us as a separate question from whether the equation represents a good fit for Widener. For all we know after consulting Dr. Martin's rather brief analysis, Widener could be an outlier. In any event, the rejection of the price-inflation theory by controlling authority makes it unnecessary for us to decide what a fact-finder could reasonably infer about Widener's conduct from Dr. Martin's analysis of data from 64 private law schools.

[11] Affirming the District Court as to Rule 23(b)(3)'s predominance requirement makes it unnecessary for us to consider the plaintiffs' challenges to the District Court's finding that Rule 23(a)(3)'s typicality requirement was also not met.

IV.

For the foregoing reasons, the order of the District Court will be affirmed.