IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| BBP HOLDCO, INC., BBP INVESTMENT HOLDINGS LLC, BRUNSWICK BOWLING PRODUCTS, LLC, BRUNSWICK BOWLING MAGYARORSZAG KORKLATOLT FELELOSSEGU TARSASAG, and BBP REYNOSA S. DE R.I. DE C.V. | ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) | |
| v. | ) ) | C.A. No. N20C-10-135 PRW CCLD |
| BRUNSWICK CORPORATION, | ) ) | |
| Defendant. | ) | |

Submitted: April 17, 2025
Decided: July 14, 2025

## DECISION AFTER TRIAL

David A. Dorey, Esquire, James G. Gorman III, Esquire, BLANK ROME, LLP, Wilmington, Delaware; James T. Smith, Esquire, Brian S. Paszamant, Esquire, D. Morgan Barry, Esquire, BLANK ROME, LLP, Philadelphia, Pennsylvania, *Attorneys for Plaintiffs BBP Holdco, Inc., BBP Investment Holdings LLC, Brunswick Bowling Products, LLC, Brunswick Bowling Magyarorszag Korklatolt Felelossegu Tarsasag, and BBP Reynosa S. DE R.I. DE C.V.*

Kevin R. Shannon, Esquire, Christopher N. Kelly, Esquire, Callan R. Jackson, Esquire, Emma K. Diver, Esquire, POTTER ANDERSON & COROON, LLP, Wilmington, Delaware; Nilofer Umar, Esquire, Kendra L. Stead, Esquire, Heather Benzmiller Sultanian, Esquire, William J. Lawrence, Esquire, SIDLEY AUSTIN, LLP, Chicago, Illinois; Hamilton H. Hill, Esquire, Reid M. Bolton, Esquire, Lee M. Mason, Esquire, Jessica R. Bernhardt, Esquire, BARTLIT BECK LLP, Chicago, Illinois, *Attorney for Defendant Brunswick Corporation.*

**WALLACE, J.**

BBP Holdco Inc.[1] brings this suit after having entered into the Stock and Asset Purchase Agreement ("SAPA") with Brunswick Corporation to purchase Brunswick Bowling & Billiards ("BBB"—which was renamed "Brunswick Bowling Products" after the sale). BBP alleges that, prior to the SAPA's closing, Brunswick made fraudulent misrepresentations regarding an existing or potential recall of its pinsetter products across Europe and breached the SAPA's contractual terms.

## I. THE TRIAL

The Court held an eleven day-bench trial. During trial, the Court heard the live testimony of:

| | |
|---|---|
| David Mark Sella | Corey Dykstra |
| Louis Barbieri, III, Esq. | Steven Pully |
| James Jay Jaxon | Erick Gadman |
| Ryan Gwillim | Andrew Weatherbee |
| Randy Altman | Alan Dashwood |
| Geert van Calster | Mark Hosfield |

The parties presented video deposition testimony from Stefan Bessman, Kelly Kaiser, Nina Niejahr, Dustin McCoy, Michael Basil, Virginia Kiseljack, Sean Daugherty, and Michael De-Franco.[2] The parties also submitted around 500

---

[1] The named Plaintiffs in this action—BBP Holdco, Inc., BBP Investment Holdings LLC, Brunswick Bowling Products, LLC, Brunswick Bowling Magyarorszag Korlatolt Felelossegu Tarsasag, and BBP Reynosa S. de R.I. de C.v.—will be referred to collectively as "BBP."

[2] *See generally* Bessman Dep. (Ct. Ex. 10A); Kaiser Dep. (Ct. Ex. 9A); Niejahr Dep. (Ct. Ex. 15A); McCoy Dep. (Ct. Ex. 15B); Basil Dep. (Ct. Ex. 27A); Kiseljack Dep. (Ct. Ex. 27B); Daugherty Dep. (Ct. Ex. 28A); DeFranco Dep. (Ct. Ex. 28B).

exhibits.[3]   The Court now determines Brunswick's liability, and if any, the appropriate damages to be awarded to BBP.

## II.  APPLICABLE LEGAL PRINCIPLES AND STANDARDS

The Court has examined all exhibits submitted by the parties and considered the testimony of all witnesses, both direct and cross, live and by deposition.  During trial, the Court applied the Delaware Rules of Evidence to the testimony and the exhibits presented.  Consistent with the Court's knowledge of those rules and the specific rulings that were articulated by this Court during both pre-trial and trial proceedings, the Court has relied only on the evidence allowed under those rules and rulings for its deliberation.

As this was a bench trial, the Court is the sole finder of fact.[4]  In turn, the Court has made its own assessment of each witness's credibility and reconciled, to the best of its ability, any inconsistencies in the testimony and documentary evidence.[5]  The Court then reviewed and applied the same instructions that it would give a jury in these circumstances.[6]

---

[3]   D.I. 679 (Trial Activity Sheet); D.I. 680 (List of Exhibits Admitted into Evidence).

[4]   *Pouls v. Windmill Ests., LLC*, 2010 WL 2348648, at *4 (Del. Super. Ct. June 10, 2010).

[5]   *Pencader Assoc., LLC v. Synergy Direct Mortg. Inc.*, 2010 WL 2681862, at *3 (Del. Super. Ct. June 30, 2010) ("[I]n a bench trial, it is the Court's role to resolve the conflicts in witnesses' testimony and weigh their credibility."); *Interim Healthcare, Inc. v. Spherion Corp.*, 884 A.2d 513, 545–46 (Del. Super. Ct.  2005) (setting forth "the customary Delaware standard" a trial judge applies when assessing trial testimony and evidence in a bench trial).

[6]   *See, e.g.*, Del. Super. Ct. Civ. Pattern Jury Instr. 4.1 (Burden of Proof by a Preponderance of the Evidence); *id.* at 4.2 (Evidence Equally Balanced); *id.* at 23.1 (Evidence—Direct or

The Court has remained mindful throughout its deliberations that a plaintiff seeking judgment and relief must prove as to each of its claims, the elements thereof by a preponderance of the evidence.[7]

In reaching its verdict, the Court has considered all applicable Delaware law and each party's respective arguments, both oral and written, on the merit of the parties' claims and the weight to be accorded to witness testimony and other forms of evidence submitted.[8]

## III. FINDINGS OF FACT

For certain actions at trial, it is often difficult to completely segregate findings of fact from conclusions of law.[9] To the extent that any of the Court's findings of fact here might be more appropriately viewed as a conclusion of law, such finding

---

Circumstantial); *id.* at 23.9 (Credibility of Witnesses—Weighing Conflicting Testimony); *id.* at 23.10 (Expert Testimony).

[7] *Pouls*, 2010 WL 2348648, at *4; *Surf's Up Legacy Partners, LLC v. Virgin Fest, LLC*, 2024 WL 1596021, at *15 (Del. Super. Ct. Apr. 12, 2024), *reargument denied*, 2024 WL 3273427 (Del. Super. Ct. July 2, 2024) ("A party must prove each element by a preponderance of the evidence."). *See Grand Acquisition, LLC v. Passco Indian Springs DST*, 145 A.3d 990, 994 (Del. Ch. 2016), *as revised* (Sept. 7, 2016), *aff'd*, 158 A.3d 449 (Del. 2017) (explicating the preponderance of evidence standard); *see also Reynolds v. Reynolds*, 237 A.2d 708, 711 (Del. 1967) (defining preponderance of the evidence: "The side on which the greater weight of the evidence is found is the side on which the preponderance of the evidence exists."); *Newark Shopping Ctr. Owner, L.L.C. v. Saudades Grp., LLC*, 2025 WL 655063, at *3 (Del. Super. Ct. Feb. 26, 2025) (same).

[8] The Court may highlight certain facts and legal principles uniquely applicable to this case. But the fact that a certain principle is mentioned here does not indicate that the Court did not consider other legal principles applicable to this case and to the parties' claims and defenses during its deliberations.

[9] *Intermec IP Corp. v. TransCore, LP*, 2023 WL 5661585, at *2 (Del. Super. Ct. Aug. 23, 2023).

of fact may be considered a conclusion of law on that point.[10]

## A. THE PURCHASE OF BBB

Brunswick is a manufacturer of sporting equipment that at one time included bowling alley machinery regularly exported to the European market.[11] BBB was one of Brunswick's business divisions.[12]

In July 2014, Brunswick publicized its intention to sell BBB.[13] In the following months, BBP Holdco, LLC, began negotiating with Brunswick for a potential acquisition of BBB.[14] BBP Holdco, LLC, was represented by BlueArc Capital Management during the negotiation of the SAPA[15] and received financing from both Gladstone Investment Corporation and PNC Bank, N.A.[16]

During due diligence, Brunswick placed a draft of the SAPA and a disclosure statement ("Disclosure Schedule") in a designated data room (the "Data Room").[17] The Data Room was virtual and was open to access by potential buyers including

---

[10]  *Id.* (citing *Facchina Constr. Litigations*, 2020 WL 6363678, at *2 n.12 (Del. Super. Ct. Oct. 29, 2020) (collecting authority).

[11]  1/7/25 Trial Tr. at 116 (D.I. 706).

[12]  DX927.

[13]  Joint Statement of Stipulated Facts ¶ 26 (D.I. 695).

[14]  Complaint ("Compl.") at 6 (D.I. 1).

[15]  JX1 (Transition Services Agreement) at 10.

[16]  JX2, Section 5.5.

[17]  Joint Statement of Stipulated Facts ¶ 45.

BlueArc.[18]  The Disclosure Schedule was appended to the SAPA and provided exceptions to the various representations and warranties made in the SAPA.[19]

In May 2015, BBP Holdco, LLC, completed its purchase of BBB from Brunswick.[20]  BBP Holdco, LLC, later became BBP Holdco, Inc.,[21] one of the named plaintiffs in this action.

## B. THE SWEA NOTIFICATION AND DECISION

In July 2012, prior to Brunswick's announcement of its intent to sell BBB, the Swedish Work Environment Authority ("SWEA") issued a regulatory notice  (the "Notification") to Brunswick's Swedish distributor ("VBS").[22]  The Notification stated that SWEA "is now considering [. . .] prohibiting you from releasing on the market or making available for use the pinsetter Brunswick GSX and the kit for the accessory Brunswick original safety guard – 'Advanced guards.'"[23]  Under Swedish administrative law, a notice or a notification is issued by the government to inform the recipient of certain action or potential action without legally binding effect.[24]

On August 30, 2013, SWEA issued a decision ("Decision"), which announced

---

[18]  1/10/25 Trial Tr. at 54 (D.I. 703).

[19]  1/13/25 Trial Tr. at 143-144 (D.I. 705); 1/14/25 Trial Tr. at 119 (D.I. 708).

[20]  *See generally* JX1 (the SAPA).

[21]  Joint Statement of Stipulated Facts ¶ 1.

[22]  1/8/25 PM Trial Tr. at 100 (D.I. 704).

[23]  PX42.

[24]  1/16/25 Trial Tr. at 318 (D.I. 682).

a sales prohibition and arguably a recall of the same GSX pinsetter products addressed in the Notification.[25] Translated, the Decision—again directed to VBS—stated that SWEA:

> prohibits VBS Bowling AB from releasing on the market or making available for use the following products with the deficiencies stated under the heading "Assessment of the Work Environment Authority".
> 1. The pinsetter Brunswick GSX.
> 2. Kit for the accessory Brunswick original safety guard – "Advanced Guards"[26]

The Decision further stated that "VBS Bowling shall at the latest by 1 January 2014 recall the pinsetter Brunswick GSX with the deficiencies noted under the heading Assessment of the Work Environment Authority."[27] Under Swedish law, a decision is aimed at influencing the behavior of its recipient and is legally enforceable.[28]

### C. THE SWEA INSPECTIONS

Since the SWEA Notification and Decision were issued, Brunswick's pinsetter products sold on the Swedish market became subject to inspections by SWEA's field agents.[29] Some of the pinsetter shipments passed the inspections;

---

[25] 1/7/25 Trial Tr. at 274.

[26] PX5.

[27] *Id.*

[28] 1/16/25 Trial Tr. at 318-319.

[29] 1/13/25 Trial Tr. at 50.

others did not.[30] The shipments that passed the inspections were sold on the market without further impediment.[31]

If the products failed to pass inspections, SWEA usually requested or recommended certain modifications to the machines.[32] But in two instances, SWEA imposed monetary fines,[33] both of which were litigated in a Swedish court.[34] One fine was dismissed due to procedural issues in SWEA's request,[35] and the other which was about $24,000 was upheld in 2015.[36]

**D. BBB SALES CONTINUE IN SWEDEN.**

Under the approval of BBB's President, Brent Perrier, and a senior BBB employee, David Sella, no shipment of pinsetter products was ever curtailed from August 2013 to the closing of the SAPA in May 2015.[37] Nor was there ever a physical removal of the preexisting pinsetter products during this time period.[38] A VBS employee wrote to Mr. Sella in October 2013—a few months after the SWEA Decision—that "the case is closed as long as we deliver equipment the way I have

---

[30] JX32; JX34; 1/13/25 Trial Tr. at 138.

[31] 1/16/25 Trial Tr. at 45.

[32] 1/13/25 Trial Tr. at 37, 63.

[33] 1/9/25 Trial Tr. at 49, 106-107 (D.I. 707).

[34] *Id.* at 106.

[35] JX133; 1/9/25 Trial Tr. at 106; 1/14/25 Trial Tr. at 63.

[36] 1/9/25 Trial Tr. at 106.

[37] *Id.* at 48-50.

[38] 1/13/25 Trial Tr. at 61.

presented it to them.  There is no threat of equipment needing to be taken out."[39]

Mr. Sella forwarded this email to Mr. Perrier and notified another employee at

Brunswick that despite the "recall language," there will be no recall "as long as we

deliver fixes by end of year."[40]

Mr. Sella and Mr. Perrier believed that shipping the products was worth any

exposure to possible fines.[41]  BBB was further encouraged by a May 2014 email

from Brunswick's attorney, Stefan Bessman, which stated that a SWEA official

named Mikael Holst told him that "merely shipping machines or machine parts into

Sweden [. . .] will not trigger any fines, as long as no machine with any 'defects,'

such as the ones referred to in the August 30, 2013 decision are sold to end users

[. . .]."[42]

### E. BRUNSWICK'S MEETINGS WITH SWEA AND THE EC

In August 2014, Brunswick's representatives met with SWEA officials in

Stockholm to discuss the implications of the Decision.[43]  At this meeting—which

Brunswick's representative Ryan Gwillim reported "went very well"—the parties

agreed that BBB would install a modified design at a bowling center in Gustavsberg,

---

[39]  DX156; 1/9/25 Trial Tr. at 38-39.

[40]  DX161; 1/9/25 Trial Tr. at 39-40.

[41]  1/9/25 Trial Tr. at 49.

[42]  JX41; 1/9/25 Trial Tr. at 43-44.

[43]  1/9/25 Trial Tr. at 67; Plaintiffs' Opening Post-Trial Brief ("Pls.' Op. Post-Trial Br.") at 7-8 (D.I. 692).

Sweden, based on SWEA's prescriptions articulated in the most recent inspections.[44]

SWEA would then decide whether to "lift the ban in Sweden."[45] The meeting minutes state that, once approved, the proposed modifications "will be implemented at future installations."[46] The next meeting with SWEA was scheduled to be held in October 2014.[47]

Brunswick also met with European Commission ("EC") officials in Brussels, Belgium, in September 2014.[48] After this meeting, Mr. Gwillim wrote in an internal email sent to a fellow Brunswick representative and several BBB representatives that the EC officials were "sympathetic" to Brunswick and expressed appreciation for Brunswick's willingness to communicate.[49] The email further noted that the EC refrained from making any formal decision at the meeting.[50] Mr. Gwillim anticipated three possible outcomes of the pinsetter issue, also noting the likelihood of each: (1) "determining the ban was inappropriate (very possible)," (2) "determining that there is no remaining issue with SWEA […] (very possible),"

---

[44] JX61.

[45] *Id.*; Defendant's Proposed Findings of Fact and Conclusions of Law ("Defs.' Op. Br.") at 7 (D.I. 691).

[46] PX13.

[47] JX69.

[48] 1/9/25 Trial Tr. at 77.

[49] JX69.

[50] JX69.

and (3) "determining that the ban was appropriate and should be upheld [. . .] (unlikely in our opinion)."[51]

Brunswick met with SWEA for the second time as scheduled in October 2014.[52] There, the parties agreed on a plan for "Brunswick to refine the proposed resolutions," "SWEA to comment definitively," "Brunswick to adjust based on comments," "Brunswick to upgrade Gustavsberg according to the adjusted proposal," and a "[f]inal inspection and meeting in Gustavsberg."[53]

The next meeting between Brunswick and SWEA was scheduled to be held in April 2015.[54] Mr. Sella wrote in anticipation of this meeting:

> The focus will be on the status of the proposal and subsequent inspections of upgraded equipment […] A successful meeting with agreement by SWEA that the machines are safe could be a precursor to resolving the issues in Europe."[55]

At the meeting, SWEA officials told Brunswick that "we have found a solution," and Mr. Sella emailed Mr. Perrier: "I feel we are getting very close to putting this to bed."[56]

---

[51] JX69.

[52] DX1477; 1/9/25 Trial Tr. at 83-86.

[53] DX393.

[54] 1/9/25 Trial Tr. at 153.

[55] JX133.

[56] DX830.

### F. BBP'S DUE DILIGENCE

Prior to the SAPA's closing, BlueArc performed a significant amount of due diligence on behalf of BBP in anticipation of the purchase.[57] The third party advisors and experts involved in this due diligence were: Womble Carlyle, Grant Thornton, Stax Consulting, Ironwood Insurance, Premier Logic, Basham, Ringe y Correa, Nagy and Troscanyi, Hart & Hickman, and Private Law Group.[58] BlueArc also had previous experience purchasing or investing in assets and businesses like BBB.[59]

In Section 4.7 of the SAPA, BBP represented that it had "conducted its own independent investigation, review and analysis of the business, operations, assets, liabilities [. . .]" and was also "provided with adequate access to [BBB's] personnel, properties, premises and books and records."[60]

As to the pinsetter issue, BBP hired no subject matter experts,[61] nor did it conduct additional internet research.[62] James Jay Jaxon, who spearheaded due diligence on behalf of BlueArc, testified: "You know, as someone who had never done anything in the bowling industry before, we had to rely on the seller to identify

---

[57]  1/10/25 Trial Tr. at 92.

[58]  *Id.* at 64-69, 249-250.

[59]  *Id.* at 210-211.

[60]  JX1 at 39.

[61]  1/16/25 Trial Tr. at 234.

[62]  *Id.* at 235.

the risks that they had deemed to be material and most critical."[63] According to BBP, it was because Brunswick failed to mention the real reason for implementing the new GSNXT designs—*i.e.*, that it was in response to the European regulators' requests[64]—that BlueArc chose not to investigate the matter any further.[65]

Specifically, BBP chose not to investigate the implications of Article 11 of the Machinery Directive 2006/42/EC, even though this provision was explicitly mentioned in Disclosure Schedule 3.16 as a provision to which "SWEA believed that Brunswick's GSX pinsetter did not conform."[66] Schedule 3.16 stated in its entirety:

> Since 2006, Seller and other manufacturers of pinsetters have received challenges from European health and safety inspectors regarding compliance to the Machinery Directive. Challenges from the United Kingdom, Finland and Germany were all resolved to the satisfaction of national authorities without notable business disruption. *In August 2013, the Company's Swedish distributor received notification from the Swedish Work Environment Authority ("SWEA") that SWEA believed that Brunswick's GSX pinsetter did not conform to certain provisions of Article 11 of the Machinery Directive 2006/42/EC.* SWEA in turned notified the European Commission of its belief. As a result of the notification, Seller and the Company have continued to work with Swedish and EU authorities to ensure the pinsetters comply with such laws and regulations as applied and interpreted by these authorities, and, as Seller and the Company have done since 2006 in other jurisdictions, the Company believes it will

---

[63]  1/10/25 Trial Tr. at 52-53.

[64]  1/15/25 Trial Tr. at 282-283 (D.I. 681).

[65]  1/10/25 Trial Tr. at 37-38.

[66]  JX2 at 51.

come to an agreement with the authorities as to whether any additional guarding is necessary. The Company continues to believe that its GSX pinsetter complies with all applicable laws and regulations as currently in force, including the Machinery Directive.[67]

Mr. Jaxon didn't investigate Article 11 himself.[68] Nor did he hire any other experts or advisors[69] because he deemed that "it wasn't considered a material issue."[70] Louis Barbieri—BlueArc's lead counsel[71]—also testified that his firm didn't perform due diligence on this matter because, in his view, "[t]here hadn't been a disclosure of facts and circumstances that would merit that."[72] He underscored that "[w]e were U.S. counsel conducting diligence on U.S." issues whereas the Machinery Directive was a European matter.[73] When Mr. Barbieri sought permission from BlueArc for his firm to hire Swedish counsel to investigate Article 11, BlueArc refused to grant the permission; it also wouldn't permit the engagement of any other European counsel for this issue.[74]

Throughout this process, Brunswick and BBP maintained communication

---

[67]  Schedule 3.16, PX424 at 36 (emphasis added); JX2 at 51.

[68]  1/10/25 Trial Tr. at 178.

[69]  *Id.* at 238-239.

[70]  *Id.* at 242.

[71]  1/8/25 AM Trial Tr. at 13 (D.I. 683).

[72]  *Id.* at 108.

[73]  *Id.* at 126-128.

[74]  *Id.* at 138.

regarding the pinsetter issue. In December 2014, Brunswick and BBP discussed the pinsetter issue in a conference call.[75] During trial, Mr. Jaxon paraphrased what Brunswick—through Mr. Gwillim—told him in this call: "these kind of things come up from time to time in the industry. We have had these things come up before in the U.K. and some other places […] it's not something that, […] is of material concern."[76] At one point when BBP requested additional documents related to Schedule 3.16, Mr. Gwillim replied "there was nothing to review."[77]

Also, around this time BBP sent Brunswick a comprehensive "Information Request List," which sought information about any pending claims or litigation, or issues related to government regulation and legal compliance.[78] In response to this request, Brunswick "pointed to us [*i.e.*, BBP] to Section 3.16 of the disclosure schedules."[79]

Meanwhile, at the request of Mr. Gwillim, Mr. Sella compiled a collection of information regarding the SWEA issue and provided the materials to him—after some significant delay—on March 18, 2015.[80] Mr. Gwillim ultimately didn't upload

---

[75]  1/13/25 Trial Tr. at 290.

[76]  1/10/25 Trial Tr. at 79.

[77]  *Id.* at 80.

[78]  JX93.

[79]  1/10/25 Trial Tr. at 71.

[80]  1/14/25 Trial Tr. at 172, 184.

Mr. Sella's tardy materials to the Data Room, believing the issue had already been put to bed by the parties by the time Mr. Sella handed them in.[81] The SWEA issue was "far outside the top ten" items discussed during due diligence;[82] the "biggest issue" in BBP's due diligence was an unrelated environmental issue.[83]

Given timing issues, logistics, and the setting of other higher priorities by the parties in trying to close the highly anticipated sale, BBP never received all the GSX-related documents it had asked for.[84] BBP nonetheless executed the SAPA on April 13, 2015, and closed on May 22, 2015.[85]

### G. POST-CLOSING

Near the end of November 2015, SWEA issued a Formal Request,[86] which approved Brunswick's proposed modifications but also required BBB to apply these modifications to all pre-existing pinsetters.[87] Shortly after the Formal Request was issued, Mr. Sella informed Mr. Perrier that "Swedish inspectors have finally agreed with our latest guarding solution that it complies with EU regs. Unfortunately,

---

[81] *Id*. at 184.

[82] *Id*. at 62.

[83] *Id*. at 278; 1/8/25 AM Trial Tr. at 106-107.

[84] 1/8/25 PM Trial Tr. at 46-47; 1/10/25 Tr., 190-191.

[85] Joint Statement of Stipulated Facts ¶¶ 55, 58; 1/16/25 Trial Tr. at 307.

[86] 1/16/25 Trial Tr. at 346; 1/21/25 Tr., 84-85 (D.I. 709).

[87] 1/9/25 Trial Tr. at 193, 233.

they've requested that we recall all previous models and upgrade them."[88]  The information about this Formal Request was shared at BBP's January 2016 board meeting.[89]  In response, BBP made an indemnification request by submitting a Claim Notice to Brunswick.  Brunswick declined.[90]

After having been notified by SWEA, the European Commission conducted its own investigation to determine whether the SWEA measures were justified.[91]  When the European Commission issued a decision in December 2018 ("Implementing Decision") confirming the SWEA Decision,[92] BBP filed an appeal to challenge the Implementing Decision at the General Court of the European Union.[93]  In September 2021, the General Court handed down a decision confirming the Implementing Decision.[94]  BBP then appealed the General Court's decision to the Court of Justice of the European Union ("CJEU").[95]  Years later, in April 2023, the CJEU ruled against BBP, reaffirming the SWEA Decision.[96]

BBP then switched its stance from resistance to compliance.  In August 2023,

---

[88]  DX913; 1/9/25 Trial Tr. at 198-199.

[89]  DX919; 1/16/25 Trial Tr. at 145-146.

[90]  JX1 § 8.3; PX314.

[91]  1/8/25 PM Trial Tr. at 108.

[92]  PX46, Commission Implementing Decision (EU) 2018/1960, 2018 O.J. (L 315) 29.

[93]  1/8/25 PM Trial Tr. at 113-114.

[94]  PX733.

[95]  1/8/25 PM Trial Tr. at 120-121.

[96]  JX164; 1/21/25 Trial Tr. at 102.

BBP contacted all EU nations where it sold the pinsetter products to inquire about a solution.[97] Some countries were silent, replied, others replied,[98] and each country that did so sought different kinds and degrees of remedial measures for the pinsetter issue.[99] BBP eventually chose the strictest compliance measures available in Europe based on the French regulators' proposed remedy, and implemented it across Europe.[100]

## H. BBP'S CONTENTIONS

BBP now seeks damages alleging that Brunswick made fraudulent misrepresentations about the GSX pinsetter issue in the form of (1) silence in the face of a duty to speak, (2) deliberate concealment, and (3) overt misrepresentations. BBP seeks $23,123,040 for the costs it says are associated with resolving the GSX pinsetter issue across Europe, attorney's fees, and pre-judgment interest.[101]

BBP contends that Brunswick was silent in the face of a duty to speak because Brunswick did not share information that may have alerted BBP to the possibility of a recall.[102] BBP claims that the SAPA only mentions the SWEA Notification without

---

[97]  1/15/25 Trial Tr. at 110-111.

[98]  1/21/25 Trial Tr. at 102.

[99]  *Id.* at 134; 1/22/25 Trial Tr. at 133-135 (D.I. 710).

[100]  1/21/25 Trial Tr. at 125-126.

[101]  Pls.' Op. Post-Trial Br. at 37.

[102]  *Id.* at 43-44.

mentioning the Decision,[103] the SAPA fails to directly mention any "recall" or "ban,"[104] Brunswick failed to provide all the documents that BBP requested,[105] and the SAPA failed to disclose the risk of the recall and sales prohibitions across Europe.[106]

BBP further contends that Brunswick deliberately concealed the pinsetter issue by advising BBP that there were no recalls or government notices, even though Brunswick was aware of SWEA's notification of the European Commission of a recall and sales prohibition.[107] BBP also alleges that Brunswick ultimately failed to be responsive to BBP's document requests even while earlier representing that Brunswick would provide the requested information.[108]

BBP claims that SAPA §§ 3.15, 3.16, 3.17, and 3.22 contained overt misrepresentations, which thereby constituted a breach of § 6.1(a) of the SAPA that provides that the representations and warranties in Article 3 of the SAPA were "true and correct in all respects as of the Closing."[109] Moreover, BBP claims that the

---

[103] Pls.' Op. Post-Trial Br. at 20.

[104] Plaintiffs' Post-Trial Answering Brief ("Pls.' Post-Trial Ans. Br.") at 21 (D.I. 700).

[105] *Id*. at 21 (citing *Great Hill Equity Partners IV, LP v. SIG Growth Equity Fund I, LLLP*, 2018 WL 6311829, *39 (Del. Ch. 2018) ("despite [defendants'] willingness to discuss chargebacks with [plaintiff], they withheld the actual notices that underlined those chargeback issues.")).

[106] Pls.' Op. Post-Trial Br. at 21; Pls.' Post-Trial Ans. Br. at 21.

[107] Pls.' Op. Post-Trial Br. at 47.

[108] Pls.' Post-Trial Ans. Br. at 18-22.

[109] Pls.' Op. Post-Trial Br. at 38-41; *see* SAPA § 6.1(a).

alleged breach of these provisions triggered SAPA § 8.1's indemnification obligations.[110]

## IV. ANALYSIS AND LEGAL FINDINGS

In Delaware, fraud requires a plaintiff to show "(1) a false representation, usually of fact, made by the defendant; (2) the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth; (3) an intent to induce the plaintiff to act or to refrain from acting; (4) [that] the plaintiff's action or inaction was taken in justifiable reliance upon the representation; and (5) damage to the plaintiff as a result of such reliance."[111] The first element— "false representation"—may take the form of the defendant's: (1) overt misrepresentation; (2) deliberate concealment of material facts; or (3) silence in the face of a duty to speak.[112]

### A. BRUNSWICK MADE NO PRE-CLOSING, NON-CONTRACTUAL FALSE REPRESENTATIONS.

BBP has failed to meet its burden of proving by the preponderance of the evidence that Brunswick engaged in fraud via non-contractual false representations prior to the closing of the SAPA. Contrary to BBP's claims, Brunswick was neither

---

[110] JX1 § 8.1; Pls.' Op. Post-Trial Br. at 41-42.

[111] *Kostyszyn v. Martuscelli*, 2015 WL 721291, at *3 (Del. Super. Ct. Feb. 18, 2015). *See also Crowhorn v. Nationwide Mut. Ins. Co.*, 2001 WL 695542, at *5 (Del. Super. Ct. Apr. 26, 2001).

[112] *Great Hill Equity Pr's*, 2018 WL 6311829, at *32 (citing *Stephenson v. Capano Dev.*, 462 A.2d 1069, 1074 (Del. 1983)).

- 19 -

silent in the face of a duty to speak nor deliberate in concealing material facts.

Absent some pre-existing fiduciary or contractual duty to disclose information, there is no general duty to speak.[113]  Even so, if a party to an arm's length transaction *does* choose to speak, then the speaker may not lie or speak "partially or obliquely such that what the party conveys becomes misleading."[114]  The speaker is thereby bound by a duty to disclose because "the choice to speak exposes the speaker to liability if his words are materially misleading."[115]

A statement can be materially misleading "because of [the speaker's] failure to state additional or qualifying matter[s],'" and this duty to disclose can be epitomized as a "duty to make a *full and fair disclosure* as to the matters about which [one] assumes to speak."[116]  Although this "full and fair disclosure" language is most commonly invoked as a corporate fiduciary duty,[117] Delaware courts have on occasion referenced such more broadly when examining arms-length transactions.[118]

---

[113] *Albert v. Alex. Brown Mgmt. Servs., Inc.*, 2005 WL 2130607, at *3 (Del. Ch. Aug. 26, 2005).

[114] *Prairie Cap. III, L.P. v. Double E Holding Corp.*, 132 A.3d 35, 52 (Del. Ch. 2015).

[115] *Corp. Prop. Assocs. 14 Inc. v. CHR Holding Corp.*, 2008 WL 963048, at *6 (Del. Ch. Apr. 10, 2008).

[116] *Corp. Prop. Assocs. 14 Inc.*, 2008 WL 963048, at *6 (emphasis added).

[117] *Loudon v. Archer-Daniels-Midland Co.*, 700 A.2d 135, 143 (Del. 1997) ("It is well established that 'directors of Delaware corporations are under a fiduciary duty to disclose *fully and fairly* all material information within the board's control when it seeks shareholder action.'") (emphasis added). *See also In re GGP, Inc. S'holder Litig.*, 282 A.3d 37, 62 (Del. 2022).

[118] *See Corp. Prop. Assocs. 14 Inc.*, 2008 WL 963048, at *6 (citing *Lock v. Schreppler*, 426 A.2d 856, 862 (Del. Super. Ct. 1981) ("Although there is no general duty to speak, nevertheless, if a person undertakes to speak, he then has a duty to make a full and fair disclosure as to the matters about which he assumes to speak.")). *See also In re Wayport, Inc. Litig.*, 76 A.3d 296, 323 (Del.

Importantly, this "duty to make a full and fair disclosure" does not mean that one must give *every* single detail about a certain matter. Generally, "Delaware law does not require disclosure of […] speculative information which would tend to […] inundate [the listener] with an overload of information."[119] A partial disclosure is not materially misleading unless there is "a substantial likelihood" that the omitted information would have "significantly altered the 'total mix' of information made available."[120] A partial disclosure is permissible so long as it is considered "fair." When the listener is a sophisticated party, it is considered "fair" to disclose facts that are enough to allow that listener to pursue its own additional investigation.[121]

That said, once a speaker allows the listener to conduct additional investigation, then the speaker "cannot conceal information [. . .] because permitting the investigation operates as the functional equivalent of providing information."[122]

### 1. Brunswick chose to speak and properly disclosed the SWEA issue.

Brunswick chose to speak prior to the closing of the SAPA regarding the

---

Ch. 2013).

[119] *Arnold v. Soc'y for Sav. Bancorp, Inc.*, 650 A.2d 1270, 1280 (Del. 1994).

[120] *Arnold*, 650 A.2d at 1277 (citing *Rosenblatt v. Getty Oil Co.,* 493 A.2d 929, 944 (Del. 1985) (citing *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449 (1976)) and adopting the *TSC* materiality standard as Delaware law)).

[121] *See e.g. In re JCC Holding Co., Inc.*, 843 A.2d 713, 721 (Del. Ch. 2003) (finding a fair disclosure where a "proxy statement was written in a manner that allowed a reasonably sophisticated investor to see the key judgments that [a party] made […].").

[122] *Prairie Cap. III, L.P.*, 132 A.3d at 52 (citing *Stephenson,* 462 A.2d at 1074).

Swedish pinsetter issue by voluntarily sharing such via the Data Room—including the draft of the SAPA and the Disclosure Schedules [123]—and during verbal communications with BBP.[124] Such a decision to speak exposed Brunswick to potential liability for fraud.[125] Even so, under Delaware law, Brunswick was not then required to disclose the pinsetter issue in more exacting detail to BBP, a sophisticated party.[126]

Brunswick disclosed what was needed, so that its representations were not materially misleading.[127] And Brunswick permitted BBP to conduct its own investigation.[128] Although the SWEA issue was "far outside the top ten" issues discussed,[129] it *was* discussed during the parties' phone calls in December 2014,[130] early March 2015, and again in late March or early April 2015.[131] During the December 2014 call, Brunswick's Mr. Gwillim informed BBP that the SWEA issue was a common regulatory issue within the industry and that it was not a material

---

[123] SAPA and Schedule 3.16 were in the Data Room in November 2014. *See* Joint Statement of Stipulated Facts ¶ 45.

[124] *See, e.g.*, 1/8/25 AM Trial Tr. at 56-57; 1/14/25 Trial Tr. at 62, 278.

[125] *Prairie Cap. III, L.P.*, 132 A.3d at 52; *Corp. Prop. Assocs. 14 Inc.*, 2008 WL 963048, at *6.

[126] *In re JCC Holding Co., Inc.*, 843 A.2d 713, 721 (Del. Ch. 2003).

[127] *See Corp. Prop. Assocs. 14 Inc.*, 2008 WL 963048, at *6.

[128] *See Prairie Cap. III, L.P.*, 132 A.3d 35, 52 (citing *Stephenson,* 462 A.2d at 1074).

[129] 1/14/25 Trial Tr. at 62, 278.

[130] Pls.' Op. Post-Trial Br. at 21; 1/13/25 Trial Tr. at 290.

[131] 1/14/25 Trial Tr. at 286.

concern.[132] Having examined the entire trial record, the Court finds this was truthful. In response to BBP's extensive due diligence request for information on the issue, Brunswick explicitly directed BBP to the Disclosure Schedule 3.16.[133] Schedule 3.16 disclosed SWEA's Notification by stating that the Swedish distributor of BBB "received notification from the Swedish Work Environment Authority."[134] Schedule 3.16 also referenced Article 11 of the Machinery Directive, a publicly available legislative act of the European Union.[135]

When BBP requested more documents, Mr. Gwillim responded that at that time there were no additional documents to review.[136] And true, some likely could have been compiled (as they eventually were), at the time and in context of then existing events, this was not a false representation. Nonetheless, what was already disclosed sufficiently put BBP on notice of the SWEA issue and gave BBP all the information required to conduct its own investigation, as consistent with industry custom.[137] BBP's expert witness, Steven Pully, admitted during cross-examination

---

[132] 1/10/25 Trial Tr. at 79-80.

[133] 1/10/25 Trial Tr. at 71.

[134] Schedule 3.16, PX424 at 36.

[135] 1/8/25 AM Trial Tr. at 127-128; *see* Directive 2006/42/EC, of the European Parliament and of the Council of 17 May 2006 on machinery, and amending Directive 95/16/EC (recast), 2006 O.J. (L 157) 24.

[136] 1/10/25 Trial Tr. at 80-81, 115-116.

[137] *Sears, Roebuck & Co. v. Midcap*, 893 A.2d 542, 554 (Del. 2006) ("The custom or practice in a particular industry is probative of what conduct is reasonable under the circumstances.").

that it is industry custom for a buyer to conduct due diligence by independently searching publicly available information outside the Data Room,[138] which could include relatively simple internet searches.[139] And no doubt, as demonstrated during trial it is possible to find Article 11 of the Machinery Directive on the internet within a few clicks.[140]

Even a cursory glance of the text of Article 11 would have apprised a sophisticated reader of the possibility of a product recall and prohibition: "a Member State […] shall take all appropriate measures to withdraw such machinery from the market, to prohibit the placing on the market [...]."[141] BBP's own witness, Mr. Barbieri, admitted that the expression "withdraw such machinery from the market" could be understood as a recall.[142]

Despite the notice provided in the Disclosure Schedule, BBP chose not to independently investigate the implications of Article 11. Mr. Barbieri reviewed the Disclosure Schedule during due diligence,[143] but he and his law firm didn't conduct

---

[138] *Id*. at 270-271.

[139] 1/16/25 Trial Tr. at 272.

[140] 1/8/25 AM Trial Tr. at 127-128.

[141] Directive 2006/42/EC, of the European Parliament and of the Council of 17 May 2006 on machinery, and amending Directive 95/16/EC (recast), 2006 O.J. (L 157) 24, 30.

[142] *Id*. at 133.

[143] *Id*. at 19.

further due diligence regarding Article 11.[144]  Mr. Barbieri once asked his client for permission to hire a foreign law firm to further investigate this issue, but BlueArc didn't grant him the permission to hire Swedish or other European counsel.[145] Instead, BlueArc chose to rely on Brunswick "to identify the risks that they had deemed to be material and most critical."[146]  While BBP attempts to do so, it cannot so easily ascribe its own failure to conduct adequate due diligence to the scope of Brunswick's disclosure.

Schedule 3.16, with its express mention of Article 11, provided correct and adequate information required for any sophisticated party to investigate on its own. That is what the law requires.[147]

BBP was a sophisticated party when it was negotiating the SAPA[148] and it performed a significant amount of independent due diligence.[149]  BBP was alerted to but consciously and deliberately chose not to further investigate the SWEA pinsetter issue, and instead relied exclusively on the materials Brunswick had provided.[150] For Brunswick's part, it disclosed the issue with the degree of import it seemed to

---

[144]  1/8/25 AM Trial Tr. at 107-108, 126-127, 128, 130, 151.

[145]  1/8/25 AM Trial Tr. at 138.

[146]  1/10/25 Trial Tr. at 52-53.

[147]  *See In re JCC Holding Co., Inc.*, 843 A.2d at 721.

[148]  1/10/25 Trial Tr. at 15, 91, 210-211.

[149]  *Id*. at 92.

[150]  Pls.' Op. Post-Trial Br. at 44.

demand at the time. Hindsight is always 20/20. At the time this issue was in play during the negotiations, it seems no one had ever seen an enforcement action like SWEA's and the EC's before. Brunswick's non-contractual representations were not materially misleading because Brunswick made a reasonable and fair disclosure as to the pinsetter issue that it assumed a duty to speak about.[151]

## 2. Brunswick did not deliberately conceal the SWEA issue.

BBP failed to prove by a preponderance of the evidence that Brunswick deliberately concealed the SWEA issue. A "deliberate concealment of material facts" is yet another form of false representation.[152] A court may find fraud by deliberate concealment where a "defendant took some action affirmative in nature designed or intended to prevent, and which does prevent, the discovery of facts giving rise to the fraud claim, some artifice to prevent knowledge of the facts or some representation intended to exclude suspicion and prevent inquiry."[153]

Here, there was no deliberate concealment; Brunswick disclosed the pinsetter issue and its honest belief that the issue was not a material concern. This belief was based on Brunswick's positive engagement with the Swedish and the European

---

[151] *Corp. Prop. Assocs. 14 Inc.*, 2008 WL 963048, at *6.

[152] *Great Hill Equity Pr's*, 2018 WL 6311829, at *32 (citing *Stephenson,* 462 A.2d at 1074).

[153] *Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.*, 854 A.2d 121, 150 (Del. Ch. 2004).

authorities to address the issue prior to closing.[154]  Brunswick was optimistic that these discussions might lead to a lessening of regulatory burdens, as was often the case in the past in the European market.[155]  This optimistic outlook is reflected in BBB's internal assessment of the probability of recall that was shared with Brunswick's representatives.  For example, in a presentation delivered prior to meetings with SWEA, Mr. Sella informed Mr. Gwillim, Messrs. Altman, Perrier, and Dykstra, and Ms. Kaiser that there was a "20% chance of significant recalls of $.5M or greater" and merely a "5% chance of a worst case scenario" involving "$9.7M recall exposure," which Mr. Sella himself described as "extremely remote."[156]

This rosy assessment is consistent with the language of Schedule 3.16 that expresses subjective opinion, not objective certainty.  Schedule 3.16 states that "Company [i.e., BBB] *believes* it will come to an agreement" and that "Company continues to *believe* that its GSX pinsetter complies with all applicable laws and regulations."[157]  These expressions of "belief" or opinion can also be found in

[154]  1/9/25 Trial Tr. at 67, 77, 153.

[155]  Defendant's Response to Plaintiffs' Opening Post-Trial Brief ("Defs.' Resp. to Pls.' Op. Post-Trial Br.") at 2 (D.I. 699) (citing 1/7/25 Trial Tr. at 156-157); 1/8/25 AM Trial Tr. at 143; 1/10/25 Trial Tr. at 79.

[156]  Defs.' Op. Br. at 7; PX60; 1/9/25 Trial Tr. at 225; 1/13/25 Trial Tr. at 76-77.

[157]  JX2, Schedule 3.16.

Mr. Gwillim's internal comments.[158]

Contrary to Brunswick's hope-filled beliefs, SWEA recalled the pinsetter products in November 2015 via the Formal Request.[159] Brunswick committed an error in prediction—a prediction that it shared with BBP during due diligence. But "[t]he law is rightly reluctant to find that mere expressions of opinion about the future can buttress a claim of fraud."[160] Brunswick's honest disclosure and error in prediction was not deliberate concealment, *i.e.*, it was not an action "designed or intended to prevent [. . .] the discovery of facts," nor was it "some artifice."[161]

## B. BRUNSWICK MADE NO OVERT MISREPRESENTATIONS IN THE SAPA. NOR DID BRUNSWICK BREACH ITS CONTRACTUAL OBLIGATIONS.

BBP further brought a fraud claim alleging false representation in the form of an "overt misrepresentation"[162] in several of the SAPA provisions.[163] BBP also charged breach of contract regarding the same provisions[164] as well as breach of the contract's indemnification obligation.[165]

Overt misrepresentation is defined as "a representation of false statements as

---

[158] 1/15/25 Trial Tr. at 316-317.

[159] 1/22/25 Trial Tr. at 83.

[160] *Metro Commc'n Corp. BVI*, 854 A.2d at 148.

[161] *Id*. at 150.

[162] *Great Hill Equity Pr's*, 2018 WL 6311829, at *32 (citing *Stephenson,* 462 A.2d at 1074).

[163] Pls.' Op. Post-Trial Br. at 43.

[164] Pls.' Op. Post-Trial Br. at 38-41.

[165] Pls.' Op. Post-Trial Br. at 41.

true."[166] A party that makes an overt misrepresentation within a contract might be held liable for contractual fraud.[167] That party can also be liable for a breach of representations and warranties if the false statement was part of the representations and warranties provided in the contract.[168] And a breach of a representation and warranty may support a contract-borne indemnification claim[169] as well as a breach of contract claim.[170] A breach of contract requires showing (1) "a contractual obligation," (2) "a breach of that obligation by the defendant," and (3) "a resulting damage to the plaintiff."[171]

The Court finds that Brunswick made no overt misrepresentations in the SAPA and did not breach any representations and warranties. It follows then that Brunswick isn't liable for breach of any indemnification obligation, either.

### 1. SAPA Section 3.16 does not contain a misrepresentation.

BBP claims that Section 3.16 of the SAPA overtly misrepresented that

---

[166] *Vichi v. Koninklijke Philips Elecs., N.V.*, 85 A.3d 725, 774 (Del. Ch. 2014); *Metro Commc'n Corp. BVI*, 854 A.2d at 143.

[167] *Aveanna Healthcare, LLC v. Epic/Freedom, LLC*, 2021 WL 3235739, at *13 n. 117 (Del. Super. Ct. July 29, 2021); *Online HealthNow, Inc. v. CIP OCL Invs., LLC*, 2021 WL 3557857, at *1 n. 2 (Del. Ch. Aug. 12, 2021).

[168] *Arwood v. AW Site Servs., LLC*, 2022 WL 705841, at *38 (Del. Ch. Mar. 9, 2022).

[169] *Certainteed Corp. v. Celotex Corp.*, 2005 WL 217032, at *3 (Del. Ch. Jan. 24, 2005).

[170] *Anvil Holding Corp. v. Iron Acquisition Co.*, 2013 WL 2249655, at *8-9 (Del. Ch. May 17, 2013). *See also AmeriMark Interactive, LLC v. AmeriMark Holdings, LLC*, 2022 WL 16642020, at *10 (Del. Super. Ct. Nov. 3, 2022).

[171] *Humanigen, Inc. v. Savant Neglected Diseases, LLC*, 238 A.3d 194, 202 (Del. Super. Ct. 2020).

Brunswick had *not* received "any written notice from any Governmental Authority to the effect that any such Person is not in material compliance with any applicable Law" because Brunswick had received the SWEA Notification and Decision.[172]

Here, it could be argued that the 2013 SWEA Notification qualifies as a "written notice" from a governmental authority indicating Brunswick's noncompliance with the applicable Swedish laws.[173] But Brunswick adequately disclosed the relevant information in the Disclosure Schedule 3.16.[174] Given this disclosure, Brunswick made no misrepresentation via Section 3.16.

Schedule 3.16 is an exception to the SAPA representations and warranties— including Section 3.16. If a seller "disclosed a fact in a disclosure statement, that disclosure, in essence, was carved out of Sellers' representations and warranties."[175]

BBP insists that Schedule 3.16 cannot be deemed a proper exception merely because, unlike the other SAPA Article 3 provisions, Section 3.16 itself doesn't expressly contain the language "except as set forth on Section [] of the Seller Disclosure Schedule."[176] Not so.

A substantive provision isn't the only place one may look when interpreting a

---

[172] JX1 at 35; Pls.' Op. Post-Trial Br. at 20; 1/8/25 AM Trial Tr. at 21-22.

[173] 1/16/25 Trial Tr. at 10-11.

[174] Schedule 3.16, PX424 at 36 ("In August 2013, the Company's Swedish distributor received notification from the Swedish Work Environment Authority ('SWEA') that….").

[175] *Pilot Air Freight*, 2020 WL 5588671, at *6 (Del. Ch. Sept. 18, 2020).

[176] Pls.' Op. Post-Trial Br. at 39.

contract. A contract's recitals or preamble are oft an "obvious source for gaining contractual intent [ . . . ] because it is there that the parties express[] their purposes for executing the Agreement."[177] Indeed, a preamble may be deemed legally binding so long as it doesn't contradict any of the substantive provisions in the contract.[178] The Preamble to Article 3 of the SAPA expressly provides that:

> Except as otherwise set forth in the disclosure schedule delivered by the Seller to the Purchaser concurrently with the execution and delivery of this Agreement and dated as of the date of this Agreement (the "Seller Disclosure Schedule") [...]."[179]

This language doesn't contradict any of the substantive provisions of the SAPA. And as such, that language effectively renders each provision of the Disclosure Schedule, including Schedule 3.16, applicable as a valid exception to all the substantive provisions in Article 3 of the SAPA, including Section 3.16.

Accordingly, the Court finds there was no overt contractual misrepresentation in Section 3.16 of the SAPA; the written notice from SWEA was already adequately disclosed in the Disclosure Schedule 3.16.

### 2. SAPA Section 3.22 does not contain a misrepresentation.

The Court finds that there was no overt misrepresentation in Section 3.22 of

---

[177] *Citadel Holding Corp. v. Roven*, 603 A.2d 818, 823 (Del. 1992); *Stein v. Wind Energy Holdings, Inc.*, 2022 WL 17590862, at *1 n.5 (Del. Super. Ct. Dec. 13, 2022).

[178] *See Llamas v. Titus*, 2019 WL 2505374, at *16 (Del. Ch. June 18, 2019), *judgment entered,* (Del. Ch. 2019); *see also GMG Cap. Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 779 (Del. 2012) ("The meaning inferred from a particular provision cannot control the meaning of the entire agreement if such an inference conflicts with the agreement's overall scheme or plan.").

[179] JX1 at 24; 1/14/25 Trial Tr. at 194-195.

the SAPA, which states that:

> Except as set forth on Section 3.22 of the Seller Disclosure Schedule, *none* of the products sold, provided, or delivered by either of the Acquired Companies in connection with, or relating to, the Business, in each case during the immediately preceding three (3) years, has been *subject to any recall*.[180]

BBP alleges overt misrepresentation because Brunswick stated "None" in Schedule 3.22 when referring to any additional facts to disclose regarding Section 3.22 of the SAPA.[181] BBP claims that this was a false statement because the pinsetter products were already "subject to a recall" when the SWEA Decision was issued in August 2013.[182] Brunswick disagrees, and claims that no recall took place prior to the closing of the SAPA in May 2015.[183] The Court finds that Brunswick did not make a contractual misrepresentation about a "recall."

The parties' contest stems from their base disagreement over the definition of the term "recall." The SAPA doesn't define "recall."[184] Because "recall" is an undefined term in the SAPA, the Court interprets it according to its plain and ordinary meaning.[185] Brunswick claims that recall meant "asking us to remove the

---

[180] JX1 at 36 (emphasis added).

[181] Pls.' Op. Post-Trial Br. at 41, JX2 § 3.22.

[182] Pls.' Op. Post-Trial Br. at 41.

[183] Defs.' Op. Br. at 44.

[184] 1/8/25 PM Trial Tr. at 5.

[185] *Sunstone Partners Management, LLC v. Synopsys, Inc.*, 2024 WL 3813266, at \*2 (Del. Ch. Aug. 14, 2024) (citing *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Rhone-Poulenc Basic Chemicals Co.*, 1992 WL 22690 at \*12 (Del. Super. Ct. Jan. 16, 1992) ("In the absence of such a

product that was already sitting in […] centers."[186]  On the other hand, BBP cites the Black's Law Dictionary definition: "[a] manufacturer's request to consumers for the *return* of defective products for repair or replacement."[187]  Under Black's definition, a mere need for "repair or replacement" is not a freestanding element; a recall involves the manufacturer's request for a "return" of the products as well.[188]

At bottom, under the most common understanding of "recall" in American parlance, the Court finds that there was none of the pinsetter products prior to the closing of the SAPA—there had yet to be a finalized governmental action and yet to be a request to customers for the physical removal, return, or access to defective products with the intention of repairing their defects or replacing them.[189]

The November 2016 "Formal Request"[190] was the earliest identifiable event when the pinsetter products might be said to have become subject to a "recall" as that is commonly understood in everyday English or American consumer experience.

---

definition, the applicable rules of construction require that the term be given its plain, ordinary meaning.")).

[186]  1/13/25 Trial Tr. at 62.

[187]  Pls.' Post-Trial Ans. Br. at 27.

[188]  Recall, BLACK'S LAW DICTIONARY, 1522 (12th ed. 2024).

[189]  *See Recall*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/recall (last visited July 13, 2025) (as pertinent here, defining "recall" as "a public call by a manufacturer for the return of a product that may be defective or contaminated"); *In re Solera Ins. Coverage*, 240 A.3d 1121, 1132 (Del. 2020) ("This Court often looks to dictionaries to ascertain a term's plain meaning.").

[190]  1/16/25 Trial Tr. at 346.

The Formal Request was where SWEA officially affirmed its intent to impose and enforce its 2013 Decision by requiring BBB to apply the proposed modifications to its pre-existing products,[191] which then might have involved a physical removal or return of these products to fix or replace them. Until that moment, a recall was merely tentative since SWEA was engaged in dialogue with Brunswick[192] and no products were being physically removed from the market.[193]

Accordingly, Brunswick's products were not subject to a "recall" before the closing of the SAPA. Neither Section 3.22 nor Schedule 3.22 contained an overt misrepresentation.

### 3. SAPA Section 3.15 did not contain a misrepresentation.

No overt misrepresentation was made regarding Section 3.15 of the SAPA. Section 3.15 states that, at the time of the closing, BBB possessed:

> […] all material *Governmental Authorizations* that are necessary for them to conduct the Business in the manner in which it is presently conducted, and each such material Governmental Authorization is in full force and effect and the Acquired Companies and the Asset Sellers are in material compliance therewith. To Seller's Knowledge, no event has occurred that, with or without notice or lapse of time or both, would *reasonably be expected to result in the revocation, suspension, lapse or limitation* of any material Governmental Authorizations held by the Acquired Companies and the Asset Sellers to conduct the Business in the manner in which it is presently conducted.[194]

---

[191]  1/9/25 Trial Tr. at 193, 233.

[192]  1/9/25 Trial Tr. at 67, 77, 153.

[193]  1/13/25 Trial Tr. at 61.

[194]  JX1 at 35 (emphasis added).

BBP argues that Brunswick breached Section 3.15 because Brunswick had no "Governmental Authorization" to ship the products bearing the deficiencies enumerated in the SWEA Decision.[195] Brunswick replies that the term "Governmental Authorization" has a narrow meaning of an "affirmative authorization akin to licenses and permits," which was never enforced because pinsetter products continued to be shipped.[196]

The Court finds that the term "Governmental Authorization" has a broad meaning. Section 1.1 of the SAPA expressly defines Governmental Authorization as "*any* approval, consent, ratification, waiver, license, permit, registration *or other authorization* issued or granted by *any* Governmental Authority."[197] When interpreting the terms "and" and "or," Delaware courts found that "ordinarily 'and' is conjunctive, while 'or' is disjunctive."[198] Given that "[w]ords are to be understood in their ordinary, everyday meanings,"[199] the word "or" here in Section 1.1 should also be interpreted as disjunctive, which has an inclusive[200] and open-ended meaning.

---

[195] Pls.' Op. Post-Trial Br. at 38 (citing 1/13/25 Trial Tr. at 186-187, 192).

[196] Defs.' Resp. to Pls.' Op. Post-Trial Br. at 28-29.

[197] JX1 at 5 (emphasis added); Pls.' Post-Trial Ans. Br. at 27.

[198] *Weinberg v. Waystar, Inc.*, 294 A.3d 1039, 1045 (Del. 2023).

[199] *Weinberg*, 294 A.3d at 1044 n.13 (citing Antonin Scalia & Bryan A. Garner, READING LAW: INTERPRETATION OF LEGAL TEXTS 69 (2012)).

[200] *Gonzalez v. State*, 207 A.3d 147, 156 (Del. 2019) ("In ordinary English, the phrase "P or Q" on its own often suggests the inclusive sense of "or," but the addition of the word "either" before "P or Q" weighs toward the exclusive use.").

Moreover, the repeated use of the word "any" alongside the disjunctive "or other authorization" indicates that the parties intended the usage of the term "Government Authorization" to be broad.

Applying this broad definition, the Court finds that BBB possessed the required Governmental Authorizations—SWEA allowed pinsetter products to be shipped to Sweden that passed the inspections.[201] Yet, the pinsetters containing the deficiencies noted in the SWEA Decision[202] might be viewed as not enjoying "all material Governmental Authorizations" because they might need alteration to be approved.[203] And the SWEA Notification and Decision and the communications with the SWEA and the EU may cause some doubt as to whether "no event has occurred that [ . . . ] would reasonably be expected to result in the revocation, suspension, lapse or limitation of any material Governmental Authorizations."[204]

Even with that BBP-friendly read, the Court finds no misrepresentation in Section 3.15. True, no corresponding "Disclosure Schedule 3.15" exists for Section 3.15 of the SAPA.[205] But Schedule 3.16 properly disclosed cross-sectionally all the

---

[201] 1/13/25 Trial Tr. at 50, 187; 1/14/25 Trial Tr. at 78.

[202] Pls.' Op. Post-Trial Br. at 38 (citing 1/13/25 Trial Tr. at 186-187).

[203] JX1 at 35.

[204] *Id*.

[205] Pls.' Op. Post-Trial Br. at 38-39. *See also* SAPA Section 11.7:

[…] The Seller Disclosure Schedule is arranged in sections and paragraphs *corresponding to the numbered and lettered sections and paragraphs of Article 3 and Article 4, respectively*. The disclosure in any section or paragraph of the Seller Disclosure Schedule,

information that needed to be disclosed regarding "Governmental Authorizations."

The Preamble of the Seller Disclosure Schedule reads, in relevant parts:

> The Seller and the Purchaser acknowledge and agree that for purposes of the Seller Representations (a) any matter set forth in any section of the Seller Disclosure Schedule with respect to a specific representation and warranty will, in each case, also be *deemed disclosed* with respect to any other representation and warranty to the extent it is *reasonably apparent on its face that it relates to* another representation or warranty hereunder […].[206]

A contractual provision that provides "that contract language shall apply cross-sectionally where it is reasonably apparent on its face that the language is relevant cross-sectionally" can act as "a savings clause for a draftsperson's failure to adequately cross-reference a provision in" an agreement."[207]  This type of provision "excuses actions that would otherwise breach covenants where [ . . . ] absent cross-sectional applicability an inconsistency in the contractual terms would result."[208]

Specifically, this "deemed disclosed" and "reasonably apparent" language in the Preamble permits Schedule 3.16 to cross-sectionally apply to Section 3.15 as an exception, despite the apparent mismatch between the number "3.16" of the

---

and those in any amendment or supplement thereto, will be deemed to relate to each other provision of Article 3 or Article 4, respectively.

JX1 at 71 (emphasis added).

[206]  JX2 (emphasis added).

[207]  *Williams Companies, Inc. v. Energy Transfer LP*, 2021 WL 6136723, at *30 (Del. Ch. Dec. 29, 2021), *aff'd*, 2023 WL 6561767 (Del. Oct. 10, 2023).

[208]  *Id.*

Disclosure Schedule and the number "3.15" of the SAPA. It is "reasonably apparent on its face"[209] that the language of Schedule 3.16 relates to that of Section 3.15. Express references to Brunswick's interactions with the Swedish and the EU government authorities disclosed in Schedule 3.16 (e.g., "Swedish Work Environment Authority," "the European Commission," and "Swedish and EU authorities," [210]) unmistakably relate to the "Governmental Authorization" mentioned in Section 3.15.

Moreover, if Schedule 3.16 were to not apply cross-sectionally to Section 3.15, then an "inconsistency in the contractual terms would result."[211] The disclosure made in Schedule 3.16—which represents that BBB is still struggling with the regulators—directly contradicts the representation in Section 3.15 that BBB already has "all material *Governmental Authorizations*" and knows no event that may jeopardize such authorizations.[212]

The disclosure in Schedule 3.16 cross-sectionally provides an exception to the representations in Section 3.15. Therefore, Section 3.15 does not contain a misrepresentation.

---

[209] JX2; *Williams Companies, Inc.*, 2021 WL 6136723 at *30-31.

[210] Schedule 3.16, PX424 at 36 (emphasis added).

[211] *Williams Companies, Inc.*, 2021 WL 6136723, at *30.

[212] JX1 at 35 (emphasis added).

## 4. SAPA Section 3.17 did not contain a misrepresentation.

BBP alleges that there is an overt misrepresentation in Section 3.17 of the SAPA. There isn't.

Section 3.17 states, in relevant parts, that:

> there is no Proceeding pending or, to the Seller's Knowledge, threatened against any member of the Seller [ . . . ]. Except as set forth in Section 3.17 of the Seller Disclosure Schedule, to the Seller's Knowledge, no event has occurred or circumstance exists that *may give rise to*, or serve as a basis for, any Legal Proceeding [ . . .].[213]

BBP maintains that contrary to this representation, there were "ongoing legal proceedings" by the time the SAPA closed.[214] Specifically, BBP cites Mr. Bessman's email where he mentions that SWEA's responses indicate "ongoing legal proceedings here against VBS initiated by SWEA."[215] BBP also elicited trial testimony from BBB's CFO, Corey Dykstra, that the SWEA Decision letter in 2013 signals the existence of a legal proceeding.[216] Additionally, BBP asserts in its post-trial briefing that the procedure under which the European Commission would evaluate the justifiability of SWEA's measures was an "event[] that may give rise to a legal proceeding,"[217] and that "over half of BBB's 2014 legal spend was expended

---

[213] JX1 at 35 (emphasis added).

[214] Pls.' Op. Post-Trial Br. at 40.

[215] PX351.

[216] 1/16/25 Trial Tr. at 11.

[217] Pls.' Op. Post-Trial Br. at 41.

on the European pinsetter issues."[218]

### a. "Legal Proceeding" does not include SWEA or EU actions before SAPA closed.

The Court finds that there were no "ongoing legal proceedings" before the SAPA closed. The SAPA does not define the term "Legal Proceeding."[219] So again, this an undefined SAPA term that must be interpreted according to its plain and ordinary meaning.[220] "Under well-settled case law, Delaware courts look to dictionaries for assistance in determining the plain meaning of terms which are not defined in a contract."[221] According to Merriam-Webster, "legal proceedings" are "actions taken to settle an argument in a court of law."[222]

Neither SWEA's Notice, Decision, nor any other pinsetter-related communication prior to the Closing fits this definition—which, no doubt, is consistent with the plain, ordinary understanding of "legal proceeding."

There is no evidence that such communications involved a court of law. The European Commission was involved at that time,[223] but the European Commission

---

[218] Pls.' Op. Post-Trial Br. at 40.

[219] JX1 at 7.

[220] *Sunstone Pr's Mgt.*, 2024 WL 3813266, at *2; *Rhone-Poulenc Basic Chem. Co.*, 1992 WL 22690 at *12.

[221] *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 738 (Del. 2006).

[222] *Legal Proceedings*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/legal%20proceedings (last visited July 13, 2025).

[223] 1/8/25 PM Trial Tr. at 108; "Commission Implementing Decision (EU) 2018/1960," PX46.

is not a court of law. It is rather a "chief enforcer of EU law," an executive branch within the supranational EU system. [224] Messrs. Bessman and Dykstra's characterization of the SWEA letters as evidence of "legal proceedings" isn't determinative. Under a common understanding of that term there *were* no then-extant (or even then-threatened) legal proceedings by the time the SAPA closed. Again, in context, it was honestly believed to be a normal regulatory matter that would be resolved with and by executive agencies without any more formal proceedings.

### b. BBB's pre-closing attorney's fees did not arise out of "legal proceedings."

BBP alleges that BBB's 2014 expenditure on attorney's fees constitutes evidence of a legal proceeding.[225] It doesn't.

The attorney's fees that BBP paid prior to the closing of the SAPA covered various forms of legal services, including due diligence, transactional work, and providing advice regarding the SWEA issue.[226] But none of these services involved a "legal proceeding."

Now-plaintiff BBP's attorneys only began engaging in "actions taken to settle

---

[224] 1/15/25 Trial Tr. at 36.

[225] Pls.' Op. Post-Trial Br. at 40.

[226] 1/13/25 Trial Tr. at 206; 1/9/25 Trial Tr. at 219; 1/10/25 Trial Tr. at 50.

an argument in a court of law"[227] after they started preparing for an appeal of the European Commission's Implementing Decision to the General Court of the European Union, which occurred after closing.[228] Within the EU system, the General Court is a court of law whose decision could subsequently be appealed to the Court of Justice of the European Union.[229] Here, the Implementing Decision that confirmed SWEA's measures[230] was issued on December 10, 2018.[231] Yet again, that is best described as action by an executive agency—not what one would commonly call a "legal proceeding." A "legal proceeding," if any, could have begun only after December 10, 2018—more than three years after the SAPA closed on May 22, 2015.[232]

### c. Even if EU actions were an event that may give rise to a legal proceeding, they were disclosed in the SAPA.

One might generously suggest that the involvement of the European Commission was an "event[] that may give rise to a legal proceeding."[233] This is because the EC's activities could be subject to the supranational EU judiciary's

---

[227] *Legal Proceedings*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/legal%20proceedings (last visited June 30, 2025).

[228] 1/8/25 PM Trial Tr. at 113-114.

[229] JX164 at 2.

[230] Commission Implementing Decision (EU) 2018/1960, 2018 O.J. (L 315) 29, PX46.

[231] PX46; 1/15/25 Trial Tr. at 108.

[232] Joint Statement of Stipulated Facts ¶ 58; 1/16/25 Trial Tr. at 307.

[233] JX1 at 35; Pls.' Op. Post-Trial Br. at 41.

review for violation of EU law.[234]  Even so, the EC's relevant activities here were cross-sectionally disclosed in the Disclosure Schedule 3.16,[235] which states that SWEA "notified the European Commission of its belief.  As a result of the notification, Seller and the Company have continued to work with Swedish and EU authorities."[236]

Similarly, Schedule 3.17 expressly provides that as to "Commercial" matters in Legal Proceedings, "[t]he item set forth on Section 3.16 of the Seller Disclosure Schedule is hereby incorporated herein by reference."[237]  The information regarding the SWEA Notification in Schedule 3.16 was thereby incorporated into Schedule 3.17 by reference, which was then disclosed as an exception to Section 3.17.  Either way, the possible event that may give rise to a legal proceeding was disclosed as an exception provided in Schedule 3.16.  Therefore, there was no misrepresentation in Section 3.17 of the SAPA.

In sum, the Court finds that BBP failed to meet its burden of proving that Brunswick made any fraudulent representation within the SAPA.  And because there was no false representation in the SAPA, the Court needn't address the remaining

---

[234]  1/15/25 Trial Tr. at 179-180.

[235]  JX2 at 51. *See also Williams Companies, Inc.*, 2021 WL 6136723, at *30.

[236]  Schedule 3.16, PX424 at 36.

[237]  Defs.' Resp. to Pls.' Op. Post-Trial Br. at 31 (citing JX2 at 52).

elements of BBP's fraud or breach-of-contract claims arising therefrom. [238] Brunswick is not liable for any related contractual or indemnification obligations.

## C. BBP IS NOT ENTITLED TO DAMAGES.

BBP seeks damages based on the foregoing allegations, but the Court finds that Brunswick did not act fraudulently or breach the SAPA. Any losses that BBP claims to have suffered aren't attributable to any alleged wrongdoing by Brunswick. Since BBP failed to prove any of its claims of liability by a preponderance of the evidence, it is not entitled to damages.

## V. CONCLUSION

BBP brought this suit insisting that Brunswick was liable for fraud for various alleged non-contractual misrepresentations made prior to the closing of the SAPA. BBP also claimed breach of contract for representations and warranties in the SAPA and breach of the indemnities clauses connected therewith. BBP's claims now hyperfixate on a particular issue in this deal that—for good reason given Brunswick's prior experience and BBP's then-shifting focus on other aspects of the sale—seemed of little moment to either party at the time but—to all parties' surprise and dismay—simply went unexpectedly (and expensively) sideways. The Court is unburdened by such an obsessive perception affliction when weighing the evidence,

---

[238] *See Kelley v. Procino-Wells & Woodland, LLC*, 2025 WL 48175, at *14 (Del. Ch. Dec. 27, 2024); *Phage Diagnostics, Inc. v. Corvium, Inc.*, 2023 WL 3491882, at *11 (Del. Super. Ct. May 2, 2023).

making credibility determinations, and rendering its trial decision and verdict.

Following an eleven-day trial, the Court finds in favor of Brunswick. Having considered the content of the entire trial and the various exhibits and briefs submitted, the Court finds that BBP has proven not a single one of its fraud or breach-of-contract claims by a preponderance of the evidence. The Court does not find Brunswick liable, and accordingly, no damages shall be awarded.

**IT IS SO ORDERED.**

/s/ *Paul R. Wallace*

_____

Paul R. Wallace, Judge